**In re Herschel D. SHIRLEY, Appellant.**

**No. 09–FM–1182.**

District of Columbia Court of Appeals.

Submitted April 12, 2011.
Decided April 16, 2011.
Amended June 23, 2011.

changed to Associate Judge, Retired, on April 7, 2011.

Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, John J. Woykovsky, Assistant Attorney General, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, for appellee.

Before THOMPSON, Associate Judge, REID,* Associate Judge, Retired, and FARRELL, Senior Judge.

THOMPSON, Associate Judge:

After a bench trial, appellant Herschel Shirley was found guilty of three counts of criminal contempt for violation of a civil protection order ("CPO") sought by complainant Tashi Brown and issued by the Superior Court on December 10, 2008.[1] On appeal, his argument is twofold: (1) the trial court erred in finding him in contempt of a civil protection order when Brown consented to his contacts (in light of their "ongoing romantic relationship"); and (2) the trial court did not have jurisdiction to find him in contempt because the government failed to show that "Brown reside[d], live[d], work[ed], or attend[ed] school in the District of Columbia" at the time of the violations and that the violations occurred in this jurisdiction. Unpersuaded by the arguments, we affirm the judgment of conviction.

## I. Factual Background

The record shows that in December 2008, Tashi Brown filed a petition and affidavit for a CPO against appellant Shirley, then her boyfriend of a year. On December 10, 2008, Shirley signed a Consent CPO Without Admissions, which by

Chantal Jean–Baptiste, appointed by the court, for appellant.

* Judge Reid's status changed to Associate Judge, Retired, on April 7, 2011.

1. Shirley was tried on a criminal contempt count relating to threats that he allegedly made to Brown, but he was acquitted on that count.

its terms was effective for the ensuing twelve-month period. The CPO ordered Shirley not to "assault, threaten, harass, or stalk [Brown], or destroy [Brown's] property[,]" and to "stay at least 100 feet away from [Brown's] person, home, workplace, vehicle[,]" and prohibited Shirley from contacting Brown "in any manner, including but not limited to: by telephone, in writing, in any other manner; either directly or indirectly through a third party[.]" It also ordered Shirley not to "call [Brown's] workplace . . . email or text message [Brown]." The CPO further explicitly warned, in bold lettering, that "FAILURE TO COMPLY WITH THIS ORDER IS A CRIMINAL OFFENSE" and that "ONLY THE COURT CAN CHANGE THIS ORDER."

Brown testified at a hearing on August 18, 2009, that (notwithstanding the CPO that was in place) she and Shirley had been "in a [romantic] relationship together for about a year and a half" and that, although Brown had obtained two CPOs against Shirley (one in October 2008 and one in December 2008),[2] the couple had continued to attempt to "work things out." On April 3, 2009—while the December 2008 CPO remained in effect—appellant and Brown attended "couples counseling" and then agreed to "go out to lunch" the next day, April 4. On April 4, Shirley picked-up Brown in his truck and the couple went to lunch at a restaurant in the District, where they stayed for three to four hours. According to Brown, as they were leaving the restaurant's parking lot, the couple "got into an argument" and appellant told Brown to "get the F out of his truck." Brown got out of the truck

and "started walking away from the truck" when appellant said "he was sorry . . . he didn't want to argue, he just wanted to have a good day." Brown got back into the truck, and the couple "ended up going to Anacostia Park . . . [to] talk[ ] about what just happened." While they were there, according to Brown, "[t]hings just got heated all over again."

Appellant then got a call from his sister who lives in Oxon Hill, Maryland, asking him to pick up his dog from the sister's house. According to Brown, she asked appellant to take her home before picking up the dog, but he kept driving toward Oxon Hill. Brown "continuously asked and told [appellant] that she wanted to go home" (but acknowledged that, when they arrived at the sister's apartment complex and appellant stopped the car, she (Brown) did not signal for help). Brown testified that as they left the apartment complex with the dog, she again insisted that appellant take her home, but instead appellant "pulled over . . . on the shoulder," "grabbed [Brown] by the neck and . . . pushed [her] against the passenger side window," started "banging [her] head on the passenger side window," and "threaten[ed] to kill [her]" and to "burn [her] body so that no one would ever be able to find [her]." Then appellant "circled through 495 South like past Tyson's and Dulles and loo[p]ed back around going to 495 North" and made "a lot of other threats . . . during that time" and twice "choked [Brown] again." Appellant denied these allegations.

Appellant eventually stopped at a park in Fairfax County, Virginia "to go walk the

2. In "early November 2008," Brown "got [the October 2008 CPO] vacated," during a proceeding at which appellant was in attendance, because (according to Brown) the CPO was "hurting [appellant's] position at his job" and appellant agreed to write an apology letter to

Brown and to continue attending counseling sessions with her. In December 2008, because appellant "didn't give [Brown] the letter," she "immediately came back in [to court] and . . . asked for the order to be reinstated."

dog." Brown remained in the truck until she spotted a police officer in the park and approached him. According to the officer, Brown told him that "she needed some help" because "her boyfriend wasn't letting her leave or wasn't taking her home." Appellant explained to the officer that he and Brown "were trying to reconcile their relationship" and "at some point in time ... [appellant] advised [the officer] that he had a restraining order out." The officer searched for the CPO in his computer but could not find it. Thereafter, the officer left to respond to an emergency and took both appellant's and Brown's identifications with him and instructed them not to have any contact with each other. When the officer returned, "[e]verything seemed fine" and Brown said to the officer, "It's okay. I'll just get back in the truck with [appellant]." The officer, however, insisted that they go their separate ways; he allowed appellant to leave and called a taxi for Brown.[3]

While Brown and the officer waited for the taxi, appellant "continued to call [her] and he also had sent [her] text messages." At trial, three text messages were admitted into evidence. The text messages stated, "[W]here do you need to be picked up at ... [C]an you ask the officer to call ... and ... [C]an I speak to the officer." That evening when Brown was at home, appellant called her and left a voice mail message asking her "to pick up [the phone] because apparently there was some issue with him getting back in his house ... and his sister ... was not helping him." Brown never responded to that message. Appellant also called the next day, April 5, and left a voice mail message asking Brown to answer because he did not have any place to live. Again, Brown

did not respond to his message and instead called the police.

Appellant testified that Brown had obtained the December CPO against him to take "control of [his] life," and that once they left court with the CPO, he was "back at her house ... living together." Appellant admitted to sending Brown the text messages and leaving her voice mail messages in violation of the CPO, but stated that he was not "purposely trying to, and willfully trying to violate the civil protection order."

The trial court found appellant guilty of three counts of contempt for having contacted Brown by text message at approximately 8:00 p.m. on April 4, 2009, telephoned Brown at 10:29 p.m. on April 4, 2009, and telephoned Brown at approximately 1:13 p.m. on April 5, 2009. Addressing appellant's consent defense, the court stated that appellant "was fully aware of the civil protection order ... [and] there is no case law in the District that indicates that the Petitioner may ... consent to a violation of the civil protection order and I don't find that she did, particularly at that point." The trial court found appellant not guilty of the count of the government's criminal contempt motion that related to the alleged threats to assault Brown and confine her in his car. The court did not credit Brown's testimony on this charge, noting that she did not flee from appellant when she had ample opportunity to do so and volunteered to "go back into the truck to get a ride home."

## II. Discussion

### A. The Availability of a Consent Defense

■ Appellant does not dispute that his contacts with Brown on April 4 and 5,

---

**3.** As they waited for the taxi, Brown told the officer that appellant had tried to "choke her and put his hands on her neck" but the officer

could not see any "abrasions or scars or marks or reddening" on Brown's neck.

2009, violated the terms of the December 2008 CPO that was then in effect, but contends that his conviction for contempt cannot stand because Brown "consented" to violation of the CPO when she participated in the couple's efforts to reconcile, beginning shortly after the CPO was issued; and when she willingly went out with appellant on April 4 and expressed willingness to remain with him (by telling the officer that things were "okay" and that she would get back into appellant's truck). Appellant argues that Brown never revoked her consent to his contacts, asserting that "there is nothing on the record to show that her consent had been revoked when [appellant] texted and called her that night, or when he called her the next day. She never testified that she had told him not to contact her, or that she had told him the relationship was over." Thus, appellant urges us to recognize consent as a defense to violation of a CPO—an issue we identified but did not decide in *Ba v. United States*, 809 A.2d 1178 (D.C.2002).

In *Ba*, petitioner Howard had obtained a CPO against respondent Ba in December 1999. 809 A.2d at 1180. Nevertheless, immediately following the CPO hearing, the couple resumed living together and "were attempting to work out problems in their relationship." *Id.* Three months later their relationship ended. *Id.* Six weeks later, Ba telephoned Howard and then showed up at her home, at which time he was placed under arrest for violating the December CPO. *Id.* at 1180–81. At trial, he argued that "this was not a willful violation because of the fact that Ms. Howard in fact [caused] him to violate this order by changing their living arrangements. She lived with him during the time this order was in place from time to time." *Id.* at 1181. The trial court rejected this argument, stating that "judicial orders are to be followed unless they're changed by the Court. People can't unilaterally decide

to disobey Court orders." *Id.* On appeal, Ba renewed his argument, urging in addition that because Howard "consented to the violation of the CPO when they reconciled shortly after the CPO was issued against him," the CPO "no longer had legal effect when he entered her property." *Id.* at 1182. After considerable briefing by the Public Defender Service as *amicus* and the government regarding the propriety *vel non* of recognizing a consent defense to a CPO violation, we ultimately affirmed Ba's conviction on the ground that, by the time of the alleged violation (Ba's showing up at Howard's house six weeks after their relationship ended), "Howard's consent to the violation of the CPO, if such consent was possible, was effectively revoked." *Id.* at 1183. Although recognizing that "the parties and *amicus* raise serious and complex issues regarding the consent defense," *id.*, we did not decide the issue of whether "[u]nder the circumstances of [Ba's] case, consent [was] a defense to the Civil Protection Order"; rather we declined to decide the issue because we concluded that, in any event, Howard had withdrawn her consent to Ba's contact. *Id.* at 1179.

The government argues that we need not take up the issue left unresolved in *Ba* because the evidence "establishes beyond a reasonable doubt that Ms. Brown revoked any consent to Mr. Shirley's violation of the CPO prior to the violations here in question." We think the more straightforward issue on the facts of this case, and the controlling issue, is whether a petitioner's "consent" can be a defense to a charge of contempt for violation of a CPO, and thus we proceed to analyze and resolve that issue. In so doing, we bear in mind appellant's arguments that "courts should not grant [relief for CPO violations] when a party has engaged in conduct utterly inconsistent with the orderly admin-

istration of justice" and that "consensual reconciliation over several months with [appellant] constructively and permanently modified the protection order."

■ Courts have long recognized that "[t]he orderly and expeditious administration of justice ... requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.'" *Maness v. Meyers,* 419 U.S. 449, 459, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) (quoting *United States v. United Mine Workers,* 330 U.S. 258, 293, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). This, in our view, is a sufficient basis for rejecting appellant's argument that Brown, by her (purported) consent, excused appellant from complying with the CPO. As to appellant's argument that Brown's "consent" effectively modified the CPO, we have already noted that the CPO in this case advised in bold and capital letters that "ONLY THE COURT CAN CHANGE THIS ORDER." Even if we were otherwise inclined to accept appellant's argument that a petitioner's consent can "modify" a CPO, we could not conclude that Brown was able to modify the CPO involved here.

■ Appellant contends, however, that because the legislature provided for a "private right to enforce" a CPO, Brown "had the ability to render [the CPO] unenforceable." We reject this argument. As we clarified recently, criminal contempt actions for enforcement of CPOs, even when brought by the Office of the Attorney General on behalf of a petitioner, "ha[ve] to be brought in the name and pursuant to the sovereign power of the United States." *In*

*re Robertson,* Nos. 00–FM–925 & 04–FM–1269, 2008 WL 8506708, at *2 (D.C. May 19, 2011). Further, a CPO enforcement action is "brought as an exercise of the court's authority to vindicate its order." *Id.* at *5 (noting also that criminal contempt proceedings "are designed 'to preserve the power, and vindicate the dignity of the courts, and to punish for disobedience of their orders....'" *Id.* at *6 (quoting *Bessette v. W.B. Conkey Co.,* 194 U.S. 324, 328, 24 S.Ct. 665, 48 L.Ed. 997 (1904))).[4] Respondent Brown could neither preclude the United States from exercising its sovereign power nor "preclude the Superior Court from vindicating its authority." *Id.* And, while the Council of the District of Columbia did intend to authorize victims of intrafamily offenses to seek protective orders "without necessarily going through the [Office of the Attorney General]," the Council also recognized that the public, not merely the individual complainant/petitioner, has an interest in preventing the intrafamily violence (or threatened violence) that CPOs are designed to forestall. D.C. Council, Report on Bill 4–195 at 2 (May 12, 1982). The Council's Committee on the Judiciary, explaining the "need for this legislation," expressed concern about the impact that domestic violence has on the community at large, stating:

> Violence among family members is a growing national problem as well as a local phenomenon. The public record ... is replete with testimony regarding the seriousness and widespread nature of domestic violence.... The direct harm inflicted through intrafamily violence is compounded by the fact that

4. *See also Young v. United States ex. rel. Vuitton et Fils S.A.,* 481 U.S. 787, 800, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (Criminal contempt actions "serve the limited purpose of vindicating the authority of the court. In

punishing contempt, the Judiciary is sanctioning conduct that violates specific duties imposed by the court itself, arising directly from the parties' participation in judicial proceedings." (footnote omitted)).

children, observing violence at home, learn to use force as a means of resolving interpersonal problems. They often grow up to be violent or victimized adults. Domestic violence, learned in the home, is thus maintained through an intergenerational vicious circle.

*Id.* at 1–2. Nothing in the language of the statute or its legislative history suggests a legislative intent to remove the protection of a CPO—which may be issued only upon a finding of "good cause to believe the respondent has committed or threatened to commit a criminal offense against the petitioner," D.C.Code § 16–1005(c), or, as here, upon a respondent's consent in lieu of such a finding, *see* D.C.Code § 16–1005(i)—just because the victim later consents to contact in violation of the CPO. Indeed, the Judiciary Committee report cites, as a rationale for amendments made to the statute in 1982, that "criminal prosecutions should not be made impossible solely by the action of a private party." Report on Bill 4–195 at 9. Further, our case law makes clear that, while the trial court may not extend or modify a CPO except upon motion of a party, the court may *sua sponte* hold an evidentiary hearing and find a defendant in contempt for violating a CPO, even where there has "not been any indication of interest in further proceedings by . . . the beneficiary of the protection order." *Adams v. Ferreira,* 741 A.2d 1046, 1047 (D.C.1999).[5]

■ By declining to recognize consent as a defense to a charge of criminal contempt for violation of a CPO, we would not thereby render irrelevant evidence that it was a petitioner's conduct that placed a respondent in technical violation of a stay-away order. To be punishable, contempt of a CPO must be willful. *See Hooks v. United States,* 977 A.2d 938, 939 (D.C. 2009) ("To establish the elements of a CPO violation, the government must present evidence proving beyond a reasonable doubt that defendant engaged in: (1) willful disobedience (2) of a civil protection order." (citation and internal quotation marks omitted)). Thus, for example, if the evidence showed that the petitioner approached the respondent without his encouragement or consent, or that the contact was necessitated by an emergency, or that there was some type of "compelling humanitarian consideration"[6] that justified the respondent in contacting the petitioner, the court might be unable to find that the respondent willfully violated the CPO[7] (and, indeed, the government might hesitate to prosecute any claim of contempt). Here, however, the evidence belies any theory that Brown foisted herself upon appellant without his consent and willing participation, as it was appellant who initiated the text message and telephone calls that underlie his contempt convictions. Further, the trial court specifically stated that "any argument about the necessity of

---

**5.** The principle recognized in *Adams* is consistent with other courts' recognition that Battered Woman Syndrome, or a similar phenomenon, may explain the fact that "[r]estraining orders are frequently withdrawn after the restrained party promises to change inappropriate conduct." *C.O. v. J.O.,* 292 N.J.Super. 219, 678 A.2d 748, 749 (1996) (citing authority that if a cycle of battering is repeated, "the battered woman is less likely to seek assistance from the court or anyone else" and may "sink[ ] into a state of psychological paralysis and become[ ] unable to take

any action at all to improve or alter the situation" and "feel that any attempt to resist [the batterer] is hopeless"), *overruled on other grounds by T.M. v. J.C.,* 348 N.J.Super. 101, 791 A.2d 300 (2002).

**6.** *In re Sobin,* 934 A.2d 372, 376 (D.C.2007) (Schwelb, J., concurring).

**7.** Even then, however, the respondent presumably would have an obligation to terminate the contact, if that is possible.

making that [April 5] call ... is just not something that the Court finds persuasive" and that it was "not persuaded that ... there was any viable or credible necessity defense that been raised in the case"—findings that we discern no reason to disturb.

We hold that consent of the petitioner does not bar a conviction of criminal contempt for violation of a CPO. We might be inclined to hold otherwise if there were no procedure for seeking modification or termination of a CPO, or to recognize an exception if appellant had been misled into believing that he or Brown could not seek modification or rescission of the CPO. But neither of these circumstances exists: the statute specifically contemplates that any "party to the original proceeding" may move to "extend, rescind, or modify the order for good cause shown," D.C.Code § 16–1005(d); and the record shows that appellant was present when the court agreed to rescind the October 2008 CPO, thus indicating that appellant was aware that such action was possible. It is also worth noting that the term of a CPO is limited to one year, *see* D.C.Code § 16–1005(d) (unless, upon motion by a party, the CPO is extended). Thus, passage of time without additional threats of intra-family violence (that would furnish a basis for extending the CPO) can relieve a respondent of the limitations imposed by a CPO, removing any perceived necessity for willfully violating the terms of the CPO. We note in addition that the trial court "retains broad authority to appropriately sanction persons who violate CPOs," and that broad authority includes the authority to "decline[ ] to use its contempt powers" and to "opt[ ] to use a more benevolent approach" "so as not to saddle [a respondent] with a criminal record." *Adams,* 741 A.2d at 1047–1048 & 1048 n. 1. We cannot say that the court abused its discretion in convicting appellant, having found that he acted "blatantly" in violation of a court order.

**B. Jurisdiction**

■ Relying on D.C.Code § 16–1006, appellant contends that the government failed to present evidence "that the court maintained jurisdiction to enforce the CPO because ... [t]here is no evidence that, as of April 2009, Ms. Brown was residing, working, or attending school in the District, or was under the legal custody of a District government ... [or that] the alleged violations occurred in the District." Whether a trial court has subject matter jurisdiction is a matter of law, which we review *de novo. Grayson v. AT & T Corp.,* 15 A.3d 219, 228 (D.C.2011).

D.C.Code § 16–1006 provides:

A petitioner may file a petition for protection under this subchapter if:

(1) The petitioner resides, lives, works, or attends school in the District of Columbia[;]

(2) The petitioner is under the legal custody of a District government agency; or

(3) The underlying offense occurred in the District of Columbia.

By the terms of the statute, the foregoing requirements apply only to the "fil[ing]" of a petition for a CPO, not to the "enforcement of it," as appellant's jurisdictional argument implies. In addition, the statute places no geographical limitations on where an alleged violation of a CPO issued by the Superior Court "under this subchapter" [D.C.Code §§ 16–1001 to –1006] must have occurred for the court to have the power to punish contempt of the order. *See* D.C.Code § 16–1005(f) (providing in pertinent part that "[v]iolation of any temporary or final order issued under this subchapter, or violation in the District of Columbia of any valid foreign protection

order ... shall be punishable as contempt"), D.C.Code § 16–1005(g) (providing in pertinent part that "[a]ny person who violates any protection order issued under this subchapter, or any person who violates in the District of Columbia any valid foreign protection order ... shall be chargeable with a misdemeanor"). Of particular note, both sections require "violation *in the District of Columbia*" before a "valid foreign protection order" is chargeable and punishable, but omit the phrase that we have italicized in referring to violations of CPOs issued under the statute by the Superior Court.[8] Accordingly, for the court to exercise jurisdiction and to convict appellant of contempt for violation of the December 2008 CPO, the government was not required, as appellant contends, to allege or prove that Brown "was residing, working, or attending school in the District, or was under the legal custody of a District government ... [or] that the alleged violations occurred in the District" (although, as the government points out, the evidence did in fact establish that Brown lived in the District at the time of the violations).[9]

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

---

8. In this regard, our Intrafamily Offenses statute is similar to those of other jurisdictions. *See, e.g., Matter of Richardson v. Richardson,* 80 A.D.3d 32, 910 N.Y.S.2d 149 (N.Y.App.Div. 2010) (stating that New York family offenses statute does not prohibit family court from exercising jurisdiction where family offenses occurred in another state or country).

9. *See also* D.C.Code § 16–1005(h) (providing that "[f]or purposes of establishing a violation under subsections (f) and (g) of this section, an oral or written statement made by a person located outside the District of Columbia to a person located in the District of Columbia by means of telecommunication, mail, or any other method of communication shall be deemed to be made in the District of Columbia."). Moreover, "[t]here is a presumption that 'an offense charged was committed within the jurisdiction of the court in which the charge is filed unless the evidence affirmatively shows otherwise.'" *Joiner–Die v. United States,* 899 A.2d 762, 766 (D.C.2006).