In re Kevin V. JACKSON, Appellant,

and

In re Victor S. Rogers, Appellant.

Nos. 11–FM–1123, 11–FM–1467.

District of Columbia Court of Appeals.

Argued July 16, 2012.

Decided Sept. 6, 2012.

Donald L. Dworsky, for appellant Kevin V. Jackson.

Raymond J. Rigat, for appellant Victor S. Rogers.

Nicholas P. Coleman, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Assistant United States Attorney, were on the brief, for appellee.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein was on the brief for Amicus Curiae Public Defender Service.

Joan S. Meier for Amicus Curiae Domestic Violence Legal Empowerment and Appeals Project (DV LEAP).

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Rosalyn Groce, Deputy Solicitor General, Janice Y. Sheppard, Assistant Attorney General, and Janese Bechtol, Chief, Domestic Violence Section, filed a brief for the District of Columbia as Amicus Curiae.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and REID, Senior Judge.

REID, Senior Judge:

We consolidated and expedited consideration of these appeals because they involve

significant prosecutorial and procedural due process issues relating to the enforcement of civil protection orders ("CPO") under the District of Columbia's intrafamily offenses statute, D.C.Code §§ 16–1001, *et seq.*, and because trial court judges have interpreted our case law and the statute in different ways, and hence have followed different procedures in these types of criminal contempt cases. In appeal no. 11–FM–1123, the government filed a motion asking us to reverse in part, and vacate in part the judgment of the trial court pertaining to appellant Kevin V. Jackson, and to remand part of his case for further proceedings. In appeal no. 11–FM–1467, the government moved to vacate appellant Victor S. Rogers' convictions, and to remand his case to the trial court for further proceedings.

On June 8, 2012, we issued an order reversing two of Mr. Jackson's criminal contempt convictions in response to the government's acknowledgment that there was insufficient evidence to support those convictions. We, *sua sponte*, severed the appeal concerning the third conviction. In addition, we ordered supplemental briefing, and we invited the Office of the Attorney General for the District of Columbia ("OAG"), and the Public Defender Service ("PDS") to file *amicus* briefs. On June 15, 2012, we issued an order holding the government's motion in Mr. Rogers' case in abeyance, and granting DV LEAP's motion to file an *amicus* brief.

For the reasons stated in this opinion, we hold that: (1) trial judges may initiate and preside over, but may not prosecute, a CPO indirect contempt proceeding, that is, one involving a contempt committed outside the presence of the trial judge; and (2) when the need arises for a prosecutor in an indirect criminal contempt matter relating to CPO violations in intrafamily offense cases, trial judges should first ask the United States Attorney's office or the OAG to prosecute the criminal contempt in the name of and pursuant to the sovereign power of the United States; if both the United States Attorney's office and the OAG decline to prosecute, then trial judges may appoint a private attorney to prosecute the criminal contempt in the name and on behalf of the United States. We further hold that trial judges must be scrupulously aware of due process considerations in these types of criminal contempt cases and afford a defendant due process and other protections, including a disinterested prosecutor, an impartial decision maker, an attorney, and confrontation of witnesses.

In addition, we reverse Mr. Jackson's remaining criminal contempt conviction in appeal no. 11–FM–1123. And, we vacate Mr. Rogers' criminal contempt convictions in appeal no. 11–FM–1467, and remand his case to the Family Court for further proceedings consistent with this opinion.

## FACTUAL SUMMARY

### *In re Jackson*

The record shows that the Honorable Fern Flanagan Saddler granted the petition of Schmekya West for a CPO and entered a default CPO on June 29, 2010 against Mr. Jackson, Ms. West's estranged husband; the CPO was served on Mr. Jackson on July 9, 2010. The CPO not only ordered Mr. Jackson to stay away from and have no contact with Ms. West, but also required him to "enroll in and complete a counseling program for alcohol [abuse]; drug abuse; and domestic violence," and to "enroll in designated programs TODAY in the Probation Office (CSOSA) [Court Services and Offender Supervision Agency]." CSOSA reported alleged violations of the CPO to the United States Attorney's office on August 31,

2010, November 2, 2010, March 15, 2011, April 11, 2011, and April 28, 2011.

The Honorable Brian F. Holeman convened a show cause hearing on April 29, 2011, after another trial judge had ordered Mr. Jackson to show cause why he should not be held in contempt for violating the CPO. An Assistant United States Attorney ("AUSA") confirmed that the United States Attorney's office would not prosecute the alleged violations of the CPO. The AUSA explained that "the [g]overnment's position is that … we'd just like to see … the Respondent in this matter come into … full compliance with the CPO, if at all possible." Judge Holeman found the government's position "untenable" given Mr. Jackson's "extensive record of noncompliance." In light of the position of the United States Attorney's office, and because the OAG "is no longer involved in this case," Judge Holeman stated, "this is a matter between the [trial] [c]ourt and [Mr. Jackson]." He asked defense counsel for a brief addressing counsel's challenge to the trial court's authority to proceed with the show cause hearing. At the May 31, 2011 status hearing, Judge Holeman reiterated his desire for a brief from defense counsel discussing "the authority of the [trial] [c]ourt to go forward, notwithstanding the fact that the [g]overnment was not interested in going forward."

In response to the trial court's request, defense counsel maintained that the trial judge could not prosecute Mr. Jackson. Judge Holeman disagreed with defense counsel, and he cited this court's opinion in *In re Shirley,* 28 A.3d 506 (D.C.2011), specifically the following language: "[W]hile the trial court may not extend or modify a CPO except upon motion of a party, *the court may* sua sponte *hold an evidentiary hearing and find a defendant in contempt for violating a CPO, even where there has not been any indication of interest in*

*further proceedings by … the beneficiary of the protection order." Id.* at 512 (quoting *Adams v. Ferreira,* 741 A.2d 1046, 1047 (D.C.1999)) (emphasis added, internal quotation marks omitted).

At the September 7, 2011 afternoon hearing, Judge Holeman called Mr. Jackson's probation officer (Michael Delaney) as a witness, questioned him, and ruled on objections that defense counsel made to various questions posed by the trial judge. During defense counsel's cross-examination of Mr. Delaney, the trial court interrupted periodically to pronounce a question "misleading" or to make sure the record was clear.

With respect to Mr. Jackson's remaining criminal contempt conviction, the trial court asked Mr. Delaney how the enrollment in the "programs specified in the [CPO] was handled in Mr. Jackson's case." Mr. Delaney responded that to address Mr. Jackson's "drug and alcohol treatment ordered by the [c]ourt," as well as his "admission that he had mental health problems that he said needed to be addressed," CSOSA "submit[ed] a referral to its Re–Entry and Sanctions Center" ("RSC"). Mr. Delaney personally drove Mr. Jackson to the facility, which Mr. Delaney described as "a drug treatment assessment facility" with "a 28 day program." The facility has "a unit that deals exclusively with co-occurring disorders, that is, individuals who have co-occurring substance abuse and mental health problems." Mr. Delaney further explained that the RSC "is an assessment facility, that it is not a treatment facility." In answer to the judge's question, "[w]as there treatment planned or program formulated for Mr. Jackson," Mr. Delaney replied: "It was not, Your Honor." He added that individuals who go to the RSC are "not told they cannot leave. It's understood that … they are able to leave at any

time." Mr. Jackson informed Mr. Delaney "that he would prefer to do his time in incarceration rather than continue to be under [CSOSA's] supervision." Consequently, as Mr. Delaney testified, "there was a staffing with Mr. Jackson, his case manager and his case manager's supervisor, at which time Mr. Jackson decided that he did not want to stay at the facility," and Mr. Jackson "voluntarily left at that point and did not make [further] contact with [Mr. Delaney]."

After closing argument by defense counsel, Judge Holeman announced his findings. The judge determined that Mr. Delaney's testimony "ha[d] not been impeached," and found beyond a reasonable doubt that Mr. Jackson had violated the CPO. The judge pronounced Mr. Jackson guilty with respect to violation of the CPO requirement that he enroll in and complete a counseling program for alcohol abuse, drug abuse, and domestic violence. The judge stated, "it's immaterial whether RSC is a[n] . . . assessment facility or treatment facility" so long as CSOSA "determined it appropriate to have Mr. Jackson enroll in this treatment assessment facility for the purpose of determining his future needs." The judge emphasized the CPO's direction that Mr. Jackson "shall enroll in designated programs today in the Probation Office (CSOSA)" in asserting that: "There is no volition allowed for Mr. Jackson under the [CPO] with regard to any program deemed appropriate by CSOSA for the purpose of addressing the alcohol, the drug abuse and the domestic violence programs."

### In re Rogers

The record shows that Joyelle Johnson–Rogers,[1] the estranged wife of Mr. Rogers, filed a petition for a CPO. On November 15, 2010, the Honorable José López conducted an evidentiary hearing regarding Ms. Johnson–Rogers' petition. Judge López granted Ms. Johnson–Rogers' petition, and he ordered Mr. Rogers "not [to] assault, threaten, harass or stalk" Ms. Johnson–Rogers or the senior citizens residing at her home. He further ordered Mr. Rogers not to "cross to the odd number houses on the 3900 block of Kansas Avenue" where Ms. Johnson–Rogers had her home; to "have no contact with Ms. Johnson[-Rogers] . . . by telephone, . . . in writing, or in any other manner, either directly or indirectly through another person"; and not to "destroy her property."

The case was transferred to Judge Holeman. At a hearing on July 12, 2011, Judge Holeman announced that he had cross-petitions before him: Ms. Johnson–Rogers' motions to adjudicate contempt, filed on June 22 and 29, and July 7, 2011; and Mr. Rogers' petition for a civil protection order, lodged on June 15, 2011. Judge Holeman revealed that "Ms. Johnson has moved without the assistance of counsel to prosecute the motions to adjudicate criminal contempt which cumulatively consist of ten counts"; the judge also asserted that in light of the number of counts, defense counsel "has requested or has preserved the right to a jury trial."

Judge Holeman declared, as he did in Mr. Jackson's case, that he would convene an evidentiary hearing under the authority of *Shirley, supra.* Defense counsel moved "to dismiss based upon a failure to prosecute" because the United States was not involved in the prosecution; he cited this court's decision in *In re Robertson (Robertson II )*, 19 A.3d 751 (D.C.2011) for the proposition, as he put it, "that cases such

---

1. The complainant's last name appears in the record as both "Johnson–Rogers" and "Johnson." Although she testified at trial that she prefers "Johnson," we use "Johnson–Rogers" throughout this opinion.

as [Ms. Johnson–Rogers' criminal contempt adjudication against Mr. Rogers] need to be brought in the name of [the] sovereign and pursuant to the power of [the] sovereign as well." The judge denied the motion.[2] He concluded that he could handle the Johnson–Rogers' matter in one of several ways: (1) allow the OAG to prosecute; (2) call on the United States Attorney to prosecute; (3) "appoint counsel to prosecute in the name of the sovereign"; or (4) "the court could *sua sponte* hold the evidentiary hearing necessary to hear the evidence and rendering a ruling." Judge Holeman decided on the last option.[3]

The trial court outlined the procedure to be followed, and observed that the allegations in Mr. Rogers' petition for a CPO "appear to be defenses to the allegations that [Ms. Johnson–Rogers] has raised in her various motions to adjudicate criminal contempt." Therefore, although recognizing that it would "present certain challenges," the court proposed that the allegations in Mr. Rogers' complaint could be handled during Ms. Johnson–Rogers' case, except for those "that may stand alone." The court would hear the stand alone allegations separately. In addition, Judge Holeman merged the incidents cited in Ms. Johnson–Rogers' June 22, 2011 motion to adjudicate contempt into one count of con-

tempt, treated the incident in the June 29, 2011 supplemental motion as a second count of contempt, and the July 7, 2011 incident as the third count of contempt.[4]

Defense counsel revisited the issue of whether *Shirley* and *Adams* allowed the trial court to proceed with the evidentiary hearing, as planned. Counsel insisted that those cases "don't stand for the proposition that the [trial] [c]ourt can essentially act as judge and prosecutor and fact finder." Furthermore, he stated, Mr. Rogers "is entitled to an independent fact finder." Judge Holeman expressed the view that "[t]he [c]ourt is not in the position of prosecuting the matter. The [c]ourt is in the position of hearing the evidence, allowing the appropriate procedural safeguards to protect the rights of the accused such as . . . [a]ppointment of counsel, cross-examination by counsel and the right to remain silent without that being held against Ms. Johnson[-Rogers] or Mr. Rogers." Defense counsel again advanced the argument that the trial court should ask the government whether it was interested in proceeding, but the judge responded that "the [c]ourt certainly is under no obligation to refer and see if the [g]overnment chooses to prosecute the case."

During the evidentiary hearing, Judge Holeman conducted the direct examination

2. Judge Holeman said he "underst[oo]d that there has been some confusion not only among practitioners but with regard to positions taken by judges on [the Superior Court] as to how the court should handle these motions to adjudicate criminal contempt that have been brought by individuals without the assistance of the United States Attorney or the Office of the Attorney General." Judge Holeman expressed the view that *Shirley*, decided after *Robertson II*, "restates as existing law" the opinion of this court in *Adams v. Ferreira*, 741 A.2d 1046 (D.C.1999).

3. As he did throughout the trial, defense counsel reiterated his view that *Robertson II* "appears to at least indicate that there needs

to be an exercise of power by the sovereign," and therefore, "we at least need to ask the United States Attorney what its opinion of the case is in order to determine whether or not they are interested in prosecuting." The trial court repeated its reliance on *Shirley* and *Adams*.

4. Mr. Rogers complained that given the original ten counts of contempt, he was entitled to a jury trial because the maximum punishment could exceed two years. Judge Holeman responded that he had merged the counts so that Mr. Rogers "is exposed to no more than 180 days times three."

of Ms. Johnson–Rogers.[5] Moving back in time from the most recent incident Ms. Johnson–Rogers described the events that prompted her motions to adjudicate contempt, including those summarized below. First, on July 3rd or 4th (reported in the July 7, 2011 motion), Ms. Johnson–Rogers received a 1:00 a.m. call from Mr. Rogers who was in his truck at the back of her house. He appeared to be drunk and he requested that she cancel her case against him. She refused and Mr. Rogers called her "a black ass monkey." Second, on June 25th (reported in the June 29, 2011 supplemental motion), Ms. Johnson–Rogers' daughter told her mother that Mr. Rogers was in the back of the house; Ms. Johnson–Rogers did not see him. Third, while she was in Texas, Ms. Johnson–Rogers received an unsigned greeting card and a two-page unsigned and undated letter (mentioned in the June 22, 2011 motion). Ms. Johnson–Rogers knew it was from Mr. Rogers.[6]

Defense counsel conducted rather extensive cross-examination of Ms. Johnson–Rogers, attempting to show her bias against Mr. Rogers by establishing that Mr. Rogers filed his petition for a CPO against her before she moved to adjudicate him for criminal contempt. Counsel also tried to portray Ms. Johnson–Rogers as having mental problems because she thought Mr. Rogers and others were plotting against her and because of her references to "the spirit" or the "Holy Spirit" speaking to her. In addition, he sought to cast doubt on her testimony about some of the incidents in which Mr. Rogers contacted her.

Wayne Sanders, Ms. Johnson–Rogers' oldest son confirmed that prior to going to Texas to watch his two younger siblings, he had given his cell phone to his mother so that she would be able to contact them while he was in Texas. He got his phone back when he returned to the District. On the day he returned, he received a call from Mr. Rogers who identified himself as "Vic" and he asked to speak with Ms. Johnson–Rogers.[7] On cross-examination, defense counsel sought to show Mr. Sanders' bias in favor of his mother and against Mr. Rogers.[8] Talaya Sanders, Ms. Johnson–Rogers' oldest daughter provided detailed testimony about the June 25th event when she saw Mr. Rogers behind her car around 10 p.m. Defense counsel engaged in comprehensive cross-examination about the incident, and questioned her about her father's assault on Mr. Rogers.

Judge Holeman advised Mr. Rogers of his right to testify in his own defense. Mr.

---

5. Ms. Johnson–Rogers testified that she had four children during an earlier marriage, two adult children (ages 21 and 19) and two minor children (ages 10 and 9). She separated from Mr. Rogers when she obtained her first CPO.

6. She recognized Mr. Rogers' handwriting, and called him to inform him that he had violated the CPO by sending her the communication. The judge overruled the objection to his question, "[h]ave you seen this handwriting before?" When Ms. Johnson–Rogers spoke with Mr. Rogers, she "said you just wrote me a letter," and he responded: "Prove it."

7. Mr. Sanders later saw his mother outside talking to Mr. Rogers. Defense counsel objected to questions about what Ms. Johnson–Rogers told Mr. Sanders about her conversation with Mr. Rogers. The judge overruled defense counsel objections.

8. He established that Mr. Sanders' father was in jail for having assaulted Mr. Rogers. He also posed questions to cast doubt on the truth of his testimony about the July incident. Mr. Sanders denied that his mother had mental health issues, and commented that Mr. Rogers was "bothering her, getting on her nerves."

Rogers decided not to testify.[9] After defense counsel's closing argument, Judge Holeman made extensive findings of fact and conclusions on all counts, as well as credibility determinations. Moreover, he determined that Ms. Johnson–Rogers' testimony was credible despite the fact that she appeared "to wander" at times. He commented on and generally rejected defense counsel's assertion that some of Ms. Johnson–Rogers' testimony was "incredible" or "suggestive of mental health issues." He found contempt beyond a reasonable doubt as to all three counts of criminal contempt set forth above.[10]

## ANALYSIS

### Robertson II and Shirley

In light of varying interpretations of this court's past opinions in *Robertson II, supra,* and *Shirley, supra,* by trial court judges and practitioners involved in criminal contempt proceedings in cases of intrafamily offenses, we begin by revisiting *In re Robertson,* 940 A.2d 1050 (D.C.2008) (*Robertson I* ), amended by *Robertson II,* and *Shirley* to emphasize what we did and did not decide in those cases. In the *Robertson* case, a beneficiary of a CPO moved to adjudicate criminal contempt against the alleged violator of the CPO. Unlike the cases before us, the motion to adjudicate criminal contempt was filed by the OAG on behalf of the beneficiary of the CPO. Prior to the filing of the motion, Mr.

Robertson had entered into a plea agreement with the United States Attorney pertaining to criminal offenses against the CPO beneficiary. The central issue in Mr. Robertson's case was whether his prosecution for violating the CPO contravened his plea agreement with the government. In the course of determining that the prosecution to enforce the CPO did not violate the plea agreement, we stated: "[W]e agree with the United States and the District and we hold that, under the intrafamily offense statute, a criminal contempt proceeding is properly brought in the name of a private person, here [the beneficiary of the CPO], rather than in the name of the sovereign." *Robertson I,* 940 A.2d at 1058 (citing *Green v. Green,* 642 A.2d 1275, 1279 (D.C.1994)).

Subsequently, Mr. Robertson filed a petition for writ of certiorari in the Supreme Court of the United States which granted his petition but limited its consideration to one question: "Whether an action for criminal contempt in a congressionally created court may constitutionally be brought in the name and pursuant to the power of a private person, rather than in the name and pursuant to the power of the United States." *Robertson II,* 19 A.3d at 755. Following oral argument, however, the Supreme Court dismissed the petition as improvidently granted. Four justices dissented, indicating that the answer to the question presented "is no," and noting that

9. The only witness called by Mr. Rogers was Ms. Johnson–Rogers. Defense counsel asked her a few questions pertaining to the time of the June 25th occurrence. In addition, counsel inquired whether she had ever sought mental health treatment or been recommended by a doctor for mental health treatment. She responded in the negative. To his question whether she had "ever heard sounds or voices of things that were not there," Ms. Johnson–Rogers said she had heard sounds from the webcam that Mr. Rogers had placed

on her computer "and whatever else he put in [her] house."

10. Judge Holeman sentenced Mr. Rogers to 180 days incarceration on each count, to run consecutively, but suspended all except 30 days as to count one, suspended the sentence as to counts two and three, and imposed one year of probation. In addition, he extended Ms. Johnson–Rogers' CPO for one year. The judge also scheduled a future hearing on Mr. Rogers' CPO petition.

the government (through the Solicitor General) had changed its position on whether the criminal contempt proceeding could be brought in the name of a private person. *Robertson v. United States ex rel. Watson*, —— U.S. ——, 130 S.Ct. 2184, 2185, 2189–90, 176 L.Ed.2d 1024 (2010). After obtaining supplemental briefing from the United States Attorney and the parties, we amended *Robertson I* by holding that:

(1) The criminal contempt action, initiated in the Superior Court, an Article I court under the Constitution of the United States, by the OAG on behalf of Ms. Watson, had to be brought in the name and pursuant to the sovereign power of the United States; and

(2) D.C.Code § 16–1005(f) and D.C.Code § 23–101 allowed Ms. Watson, assisted by the OAG, to initiate a criminal contempt action involving an intrafamily offense in the name of the United States for the purpose of enforcing a Superior Court CPO.

*Robertson II*, 19 A.3d at 755–56. We did not otherwise indicate who could initiate criminal contempt proceedings pertaining to alleged criminal contempts in cases of intrafamily offenses. Nor did we address the proper procedures governing those proceedings.

"The controlling issue" in *Shirley, supra*, was "whether a petitioner's 'consent' can be a defense to a charge of contempt for violation of a CPO." 28 A.3d at 510. We held "that the consent of the petitioner does not bar a conviction of criminal contempt for violation of a CPO." *Id.* at 513.

In reaching our holding, we addressed appellant's contention "that because the legislature provided for a 'private right to enforce' a CPO, [the complainant] 'had the ability to render [the CPO] unenforceable.'" *Id.* at 511. We reiterated our holding in *Robertson II* concerning in whose name and under whose authority criminal contempt actions are brought, and *Robertson II's* statement that such actions are also brought to vindicate the trial court's orders; consequently, we said, the respondent "could neither preclude the United States from exercising its sovereign power nor 'preclude the Superior Court from vindicating its authority.'" *Id.* We also stated that "our case law makes clear that, while the trial court may not extend or modify a CPO except upon motion of a party, the court may *sua sponte* hold an evidentiary hearing and find a defendant in contempt for violating a CPO, even where there has 'not been any indication of interest in further proceedings by ... the beneficiary of the protection order.'" *Id.* at 512 (alteration in original) (quoting *Adams*, 741 A.2d at 1047).[11] While the language in *Shirley*—regarding the trial court's power to "*sua sponte* hold an evidentiary hearing and find a defendant in contempt for violating a CPO"—could be interpreted broadly, significantly, that case did not raise questions relating to prosecutorial authority or the proper procedures governing criminal contempt proceedings in cases of intrafamily offenses. Consequently, there was no need to address those issues. In sum, neither in *Robertson II*,

11. The trial court in *Adams* extended the CPO for twelve months even though "no party to the original proceeding moved to have the CPO extended." 741 A.2d at 1047. We concluded that "the trial court could have held an evidentiary hearing and upon an appropriate finding held [the defendant] in contempt for violating the CPO." *Id.* The defendant, his attorney, and an Assistant Corporation Counsel (now Assistant Attorney General) appeared at the hearing conducted by the trial court. The appellant raised no issues concerning prosecutorial authority or the procedures governing criminal contempt proceedings in CPO cases.

nor in *Shirley* did we address the issues that are now before us.

### The Current Cases

Both appellants, the United States, *amicus* PDS, and *amicus* District government all contend that the trial court erred by acting as a prosecutor and as a judge in these cases. We are constrained to agree.

■ There is no doubt that trial judges hearing cases involving intrafamily offenses and CPOs may initiate and preside over criminal contempt hearings (1) when the charge is brought pursuant to the sovereign power of the United States to enforce a CPO, and (2) when necessary to vindicate the trial court's own authority. *See Shirley*, 28 A.3d at 511; *Robertson II*, 19 A.3d at 760–61. As the Supreme Court said many years ago in *Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925):

> The power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions.

*Id.* at 539. Later, the Court reiterated that: "[T]he purpose of a criminal court ... is to vindicate the public interest in the enforcement of the criminal law while at the same time safeguarding the rights of the individual defendant." *Standefer v. United States*, 447 U.S. 10, 25, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). We now address prosecutorial authority and the procedures that must be followed in CPO indirect criminal contempt cases involving intrafamily offenses.

### Prosecutorial Authority in CPO Cases

■ Under our system of government, criminal prosecution is a "core executive function," *Morrison v. Olson*, 487 U.S. 654, 688, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), and that power is allocated to the executive branch of government which executes the laws, *Clinton v. Jones*, 520 U.S. 681, 699–700, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997). "This responsibility includes the authority to investigate and litigate offenses against the United States." *United States ex rel. Phillips v. Pediatric Servs. of Am.*, 123 F.Supp.2d 990, 992 (W.D.N.C.2000) (citing *Buckley v. Valeo*, 424 U.S. 1, 138, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)); *see also Morrison, supra*, 487 U.S. at 706, 108 S.Ct. 2597 ("Governmental investigation and prosecution of crimes is a quintessentially executive function.") (Scalia, J., dissenting).

■ Here, the trial judge may have been frustrated by disobedience of the trial court's CPO orders in these sensitive cases of intrafamily offenses, and also may have been puzzled by the AUSA's statement in Mr. Jackson's case, that "the [g]overnment's position is that ... we'd like to see the Respondent in this matter come into ... full compliance with the CPO, if at all possible." Nevertheless, based on applicable legal principles, we reiterate our holding that trial judges may initiate and preside over, but may not prosecute, a CPO indirect criminal contempt proceeding in cases involving intrafamily offenses. *See Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 801, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) ("a court has the authority to initiate a prosecution for criminal contempt"); *International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 832–33, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("petty direct contempts in the presence of the court" are subject to summary adjudication but "[s]ummary adjudication of indirect contempts is prohibited").

■ In addition, we reiterate our holding that when the need arises for a prosecutor in an indirect criminal contempt matter relating to CPO violations in intra-family offense cases, trial judges should first ask the United States Attorney's office or the OAG to prosecute the criminal contempt in the name of and on behalf of the United States.[12] *See Robertson II.* If both the United States Attorney's office and the OAG decline to prosecute, then trial judges may appoint a private attorney to prosecute the criminal contempt in the name and on behalf of the United States. *Robertson II*, 19 A.3d at 755–56; *Morrison, supra*, 487 U.S. at 676, 108 S.Ct. 2597 (citing *Young, supra*). As the Court said in *Young:* "[A] court ordinarily should first request the appropriate prosecuting authority to prosecute contempt actions, and should appoint a private prosecutor only if that request is denied." 481 U.S. at 801, 107 S.Ct. 2124.

We are confronted with an important question as to whether adequate protection for a defendant in these kinds of cases requires appointment of a disinterested prosecutor. Relying on its supervisory authority, the Supreme Court said in *Young, supra:* "The prosecutor is appointed solely to pursue the public interest in vindication of the court's authority. A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution."[13] *Id.* at 804. In a footnote, the

**12.** Super. Ct. Dom. Viol. R 12(d) provides that a motion to adjudicate criminal contempt "may be filed by an individual, [the OAG] or an attorney appointed by the [c]ourt for that purpose." In addition, Rule 12(d) specifies that "[t]he motion may be referred to the United States Attorney for potential prosecution," and Rule 12(e)(2) states that the trial court "may appoint the movant[,] [OAG] or other attorney to prosecute the contempt charged." Amicus PDS urges us to exercise our supervisory authority and to hold that the trial court "*must* refer the motion to the United States Attorney for potential prosecution, unless the interest of justice requires the appointment of another attorney." If the court so holds, PDS argues, Rule 12(d) would mirror the comparable Fed.R.Crim.P. 42(a)(2). As alternate prosecutors, PDS lists the OAG and a private attorney, but asks for a holding that the private attorney of the beneficiary of the CPO may not be appointed. For the reasons set forth below, we agree that a private attorney appointed as a prosecutor in these types of cases should be disinterested. Moreover, the Superior Court will need to modify its CPO criminal contempt rules so that they are consistent with this opinion. We decline to hold, however, that trial judges "must refer" all CPO indirect criminal contempt cases to the United States Attorney in the first instance. Both the United States Attorney's office and the OAG are capable of providing disinterested prosecutors for these cases and we see no reason to insist on a system of initial referral to the United States Attorney's office; such a required referral system might well overburden that office with a large number of CPO criminal contempt prosecution requests that languish because of inadequate personnel or other equally pressing priorities. However, the trial court should inform the United States Attorney's office of any referral to the OAG or a disinterested private attorney.

**13.** By using the term "disinterested," we do not mean to suggest that the prosecutor must be "disinterested on the issue whether a prospective defendant has committed the crime with which he is charged," *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir.1984), or "indifferent to whether a victim suffered a grievous injury at the hands of the accused." Bennett L. Gershman, *Prosecutorial Ethics and Victims' Rights: The Prosecutor's Duty of Neutrality*, 9 Lewis & Clark L.Rev. 559, 562 (2005). Rather, the concern is, essentially, that the prosecutor of a criminal contempt not have a conflict of interest, *see Young*, 481 U.S. at 804 n. 15, 805, 807, 107 S.Ct. 2124; or "an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Wright*, 732 F.2d at 1056. The prosecutor is not disinterested if he or she "has a special motivation to favor

Court stated that "aside from any concern for the standards to which prosecutors are held, the attorney for an interested party . . . must reckon with the prescriptions on conflicts of interest applicable to all lawyers." *Id.* at 804 n. 15. In addition to ethical considerations and professional responsibility standards governing conflicts in representation, *Young* contrasts the "[g]overnment's interest in the dispassionate assessment of the propriety of criminal charges for affronts to the [j]udiciary," with "[t]he private party's interest . . . in obtaining the benefits of the court's order." *Id.* at 805. *Young* recognized that these interests "sometimes may be congruent," but "sometimes they may not." *Id.* The Court further declared that: "A prosecutor may be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client"; and "[c]onversely, a prosecutor may be tempted to abandon a meritorious prosecution if a settlement providing benefits to the private client is conditioned on a recommendation against criminal charges." *Id.*

Other jurisdictions have concluded that an attorney for a complaining witness or beneficiary of a court order should be disqualified from prosecuting a criminal contempt case against the alleged violator.[14] *See Sedore v. Epstein*, 56 A.D.3d 60, 864 N.Y.S.2d 543, 544 (2008) (improper to delegate prosecution of criminal action to attorney retained by complaining witness); *Rogowicz v. O'Connell*, 147 N.H. 270, 786 A.2d 841, 843–44 (2001) (error to allow attorney for beneficiary of court order to prosecute indirect criminal contempt). Because of the potential for conflicts in representation prohibited by professional responsibility rules, other ethical considerations, and the frequently diverging interests of a disinterested prosecutor and an attorney who is loyal to and an advocate for a private client, we conclude that trial judges should avoid appointing either the attorney for the beneficiary of a CPO, or a public attorney who has conflicting interests, to prosecute an indirect criminal contempt proceeding against the alleged violator of a CPO in intrafamily offense cases. While we understand that trial judges may

the victim or satisfy a victim's private agenda if that agenda is inconsistent with the prosecutor's public duty to serve all the people neutrally, i.e., equally and fairly." Gershman, *supra* at 563. *See also* Roger A. Fairfax, Jr., *Delegation of the Criminal Prosecution Function to Private Actors*, 43 U.C. Davis L.Rev. 411, 436–441 (2009) (emphasizing conflicts and corruption); Patricia Moran, *Private Prosecutors in Criminal Contempt Actions Under Rule 42(b) of the Federal Rules of Criminal Procedure*, 54 Fordham L.Rev. 1141, 1146–1161, 1166–69 (1986) (discussing a disinterested prosecutor as a due process right, approaches in state courts, conflict of interest, and ethical considerations).

14. Amicus DV Leap, a non-profit organization that handles appellate advocacy matters for victims of abuse in the District and other jurisdictions, states that other jurisdictions "have found that there is no . . . fund for 'disinterested prosecutors'" and "[i]t is un-

likely that [these types of criminal contempt] cases will attract *pro bono* counsel." In that regard, we note that apparently because of the absence of a fund to compensate private counsel in contempt proceedings in domestic relations cases, Tennessee does not automatically disqualify an attorney for the beneficiary of a CPO, holding in at least one case "that Due Process does not mandate adoption of a rule which automatically disqualifies a litigant's private counsel from prosecuting a contempt action." *Wilson v. Wilson*, 984 S.W.2d 898, 903–04 (Tenn.1998). However, in a later case the Tennessee court concluded that "the prosecution's appointment and use of a private attorney who received substantial compensation from a private, special interest group created a conflict of interest and an appearance of impropriety that required disqualification of the District Attorney General's office." *Tennessee v. Culbreath*, 30 S.W.3d 309, 310–11 (Tenn.2000).

encounter difficulties in finding disinterested prosecutors, nevertheless we emphasize the necessity of a disinterested prosecutor in these cases, whether a private or a public attorney.

Our holdings concerning the authority to prosecute these types of criminal contempt proceedings will help to avoid even the appearance of unfairness. Actual prosecution of criminal contempt by the government or an appointed disinterested prosecutor leaves the trial court free to play its essential role of impartial decision maker in cases and controversies, especially in contentious cases like the ones before us where: a larger number of counts in a *pro se* pleading may need to be merged, thus implicating a defendant's right to a jury trial; frequent objections may be made by defense counsel to questions posed by a judge essentially acting as a prosecutor; mental health questions may surface; or a defendant may be reluctant to testify because the trial judge may cross-examine him.

### Due Process Considerations and Protections for Defendants

■ "[T]he contempt power may be abused." *Pounders v. Watson*, 521 U.S. 982, 988, 117 S.Ct. 2359, 138 L.Ed.2d 976 (1997); *Bagwell, supra*, 512 U.S. at 831, 114 S.Ct. 2552 ("the contempt power also uniquely is liable to abuse") (internal quotation marks and citation omitted). To guard against the possibility of such abuse, we hold that trial court judges must be scrupulously aware of due process considerations in these types of indirect CPO criminal contempt cases, and should afford a defendant adequate protections, including notice of the charges, a disinterested prosecutor, an impartial decision maker, an attorney, and confrontation of witnesses against him or her.

■ *Cooke, supra*, summarized the basic and fundamental due process rights as follows:

Due process of law ... in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed.

267 U.S. at 537, 45 S.Ct. 390.[15] Judge Holeman recognized these due process rights, but safeguarding a defendant's due process rights, and ensuring adequate protections while prosecuting a defendant would be a tall order, even for the most conscientious trial judge. As the Supreme Court declared in *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955):

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.... "[E]very procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter the due process of law." Such a stringent rule may

---

**15.** Judge Holeman correctly articulated the standard of proof in CPO criminal contempt cases, "proof beyond a reasonable doubt that the defendant willfully disobeyed the court's order." *Shewarega v. Yegzaw*, 947 A.2d 47, 52 (D.C.2008).

sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice."

*Id.* at 136, 75 S.Ct. 623 (second alteration in original) (citation omitted).

### Sufficiency of the Evidence

■ Mr. Jackson contends that "[h]is leaving [the RSC] did not violate the CPO, and his leaving did not constitute proof beyond a reasonable doubt that he failed to enroll in a treatment program." The government argues that Mr. Jackson "clearly did not comply with" the requirement that he " 'enroll in and complete' a drug abuse treatment program." As evidence of Mr. Jackson's violation, the government relies on the fact that Mr. Jackson "walk[ed] away from CSOSA's efforts to place [him] in a program, and never return[ed] to CSOSA to be so placed." The trial court concluded that whether RSC was a treatment or an assessment facility was "immaterial," and that as long as CSOSA determined that RSC was an "appropriate" facility, Mr. Jackson was required to enroll in that program, as directed by CSOSA, because the CPO stated that "Respondent shall enroll in designated programs."

Mr. Delaney testified that Mr. Jackson was sent to the RSC to address Mr. Jackson's "drug and alcohol treatment ordered by the [c]ourt," as well as his admission that he had mental health problems that he said needed to be addressed." But, Mr. Delaney acknowledged that there was no "treatment planned or program formulated for Mr. Jackson" at the RSC, and that the RSC is "a drug treatment assessment facility" and "is not a treatment facility." Moreover, the CPO did not require Mr. Jackson to enroll in a mental health assessment program.[16] Significantly, Mr. Delaney revealed that those sent to the RSC are "not told they cannot leave." Rather, "[i]t's understood that ... that they are able to leave at any time." Because of "a staffing with Mr. Jackson," Mr. Jackson's "case manager and his case manager's supervisor" were aware that he "decided that he did not want to stay at the [RSC]." Thus, Mr. Jackson's voluntary departure from the RSC, an assessment facility, not only was consistent with the facility's policy, but Mr. Jackson also left with the knowledge of CSOSA staff assigned to his case. Under these circumstances, and given the precise CPO requirement that Mr. Jackson "enroll in and complete a counseling program for alcohol [abuse]; drug abuse, [and] domestic violence," we conclude that the evidence presented was insufficient to convict him beyond a reasonable doubt for failing to enroll in a drug treatment program. CSOSA never identified and instructed Mr. Jackson to enroll in a treatment program designated in the CPO. Therefore, we reverse his conviction on that count. We do not remand his case for a new trial because of double jeopardy considerations. *See Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ("[T]he Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, [and] the only 'just'

---

16. Because of Mr. Jackson's courtroom behavior, Judge Saddler ordered a forensic screening on March 10, 2011, to determine whether he was competent to stand trial. And after Mr. Delaney informed the trial court "that Mr. Jackson's mental health history indicates he has multiple suicidal ideations, and [Mr. Delaney] believe[d] at least two suicide attempts in the past, Judge Saddler ordered another mental health screening for Mr. Jackson on March 15, 2011.

remedy available for that court is the direction of a judgment of acquittal.").

The parties do not address the sufficiency of the evidence in Mr. Rogers' case. However, our review of the record, including the testimonial evidence and documentary evidence, and our review of the extensive factual findings and credibility determinations made by Judge Holeman, persuade us that the evidence was sufficient to convict Mr. Rogers on the criminal contempt charges. Hence, at the government's request, we vacate Mr. Rogers' convictions and remand his case to the Family Court for further proceedings consistent with this opinion.

Accordingly, for the foregoing reasons, we reverse Mr. Jackson's remaining criminal contempt conviction in appeal no. 11–FM–1123. We vacate Mr. Rogers' criminal contempt convictions in appeal no. 11–FM–1467, and we remand his case to the Family Court.

*So ordered.*