**In re Patrice TAYLOR, Appellant.**

**No. 10–FM–1167.**

District of Columbia Court of Appeals.

Argued June 12, 2012.

Decided Aug. 1, 2013.

*Dorn v. McTigue,* 157 F.Supp.2d 37, 49 (D.D.C.2001).

4. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971).

Anna B. Scanlon, appointed by this court, was on the brief for appellant.

Nicholas P. Coleman, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Assistant United States Attorney at the time, were on the brief, for appellee.

Jaclyn S. Frankfurt, with whom James Klein was on the brief, on behalf of the Public Defender Service as amicus curiae, in support of appellant.

Joan S. Meier was on the brief for amici curiae, Domestic Violence Legal Empowerment and Appeals Project (DV LEAP), Survivors and Advocates for Empowerment (SAFE), AYUDA, D.C. Coalition Against Domestic Violence (DCCADV), George Washington University Law Professor Laurie Kohn, and Catholic University Law Professor Catherine Klein, in support of appellee.

Before THOMPSON and EASTERLY, Associate Judges, and NEBEKER, Senior Judge.

EASTERLY, Associate Judge:

At the time this case was litigated, it was understood to be lawful in the District of Columbia for an individual, acting in his or her personal interest, to prosecute an-

other individual for criminal contempt based on an alleged violation of an intra-family Civil Protection Order ("CPO"). And because a private party could prosecute alleged CPO violations on his or her own initiative, such prosecutions could be used for private feuds: A defendant in one case could turn the tables on the complainant-prosecutor and retaliate in kind. This case presents just this sort of tit-for-tat "justice."

Patrice Taylor, the defendant in the underlying case, and Kimberly Hawkins, the complainant-prosecutor, are unrelated and have never lived together; their only connection is through Sydney Woodruff, a man with whom both women were at different times romantically involved. Their dispute appears to have been of their own making—one in which they engaged, in the trial judge's words, as "a game." Ms. Taylor and Ms. Hawkins obtained intra-family CPOs against each other on the same day in the fall of 2009. Each subsequently alleged that the other had violated the no-contact terms of their respective CPOs by making phone calls and sending text messages. Ms. Taylor brought criminal contempt charges against Ms. Hawkins first and had successfully prosecuted Ms. Hawkins by the time they returned to court with roles reversed in the case now on appeal—Ms. Hawkins, awaiting sentencing, prosecuted Ms. Taylor on contempt charges. By the conclusion of the case, eleven months and at least ten court dates later, both women were actively initiating and defending additional criminal contempt charges vis-à-vis the other for violating the terms of their respective CPOs. The trial judge, who had tried to take various steps throughout the proceedings to "expedite" matters, including urging "settlement," was reduced to a frustrated sideline observer, declaring that the case was "an embarrassing mess."

Since Ms. Hawkins secured Ms. Taylor's conviction, the decisional law has changed significantly. In *In re Robertson*, 19 A.3d 751 (D.C.2011) (*Robertson II*), this court held that contempt prosecutions arising out of the violation of an intrafamily CPO are not private actions and instead must be brought "in the name [of] and pursuant to the power of the United States," *id.* at 755, the sovereign body of which the District is a part. This court subsequently held in *In re Jackson*, 51 A.3d 529 (D.C. 2012) that "when the need arises for a prosecutor in an indirect criminal contempt matter relating to CPO violations in intrafamily offense cases," a trial judge must go through a two-step process to ensure that neutral counsel, representing the government, prosecutes the offense. *Id.* at 531. It must "first ask" one of the District's two institutional, public prosecutor's offices—the United States Attorney's Office (USAO) or the Office of the Attorney General (OAG)—"to prosecute the criminal contempt in the name of and pursuant to the sovereign power of the United States." *Id.* "[I]f both ... decline to prosecute," a trial judge may then "appoint a private attorney to prosecute the criminal contempt in the name and on behalf of the United States." *Id.* To satisfy due process guarantees, any court-appointed counsel must be "disinterested," just as a government prosecutor in a CPO contempt case would be. *Id.* at 531, 541; see *infra* note 13. Perforce, *Robertson II* and *Jackson* do not permit a complainant proceeding pro se to prosecute a criminal contempt action as Ms. Hawkins did.

That Ms. Taylor did not object to her then-authorized prosecution by Ms. Hawkins does not foreclose our review because we conclude that Ms. Taylor has satisfied our test for plain error. The absence of counsel representing the government at Ms. Taylor's criminal trial is not only an obvious defect under *Robertson II* and

*Jackson,* but also a structural one that compromised the fairness, integrity, and public reputation of judicial proceedings. As a consequence, we exercise our discretion to reverse Ms. Taylor's contempt conviction.

## I. Procedural History

The procedural history of this case comprises but one chapter in an ongoing feud between Ms. Taylor and Ms. Hawkins. We present this history in some detail because why and how this case was prosecuted, and in particular how the resources of the court were used, is pertinent to the disposition of this appeal.

Ms. Taylor and Ms. Hawkins, each in their early twenties, had no direct or familial relationship with each other; they only came into contact because they were both, at one time, romantically involved with Mr. Woodruff. Their dispute began with (and never went beyond) intemperate and provocative communications. These communications, initially limited to the phone and electronic media, prompted the women each to obtain CPOs against the other, at the same proceeding, on September 24, 2009. (Before that date, they had never met in person.) Each woman consented to the issuance of the other's CPO without admissions; thus the court did not make a "good cause" finding. *See* D.C.Code § 16–1005(c) (2001 & Supp.2009).

Even at this brief proceeding, the enmity and distrust between the two women were evident. At the conclusion of the proceeding, Ms. Taylor asked the judge if "there [was] a way that I can get in any trouble if anything happens to kick off as I might leave this courtroom?" and Ms. Hawkins asked the judge if the Marshals or court personnel would serve as an "escort service" as she left the courthouse. These questions prompted the judge to remark, "I think—I think you're adults, right?" and "You can handle this? Okay."

The judge's optimism proved unfounded. Three months later, on the last day of 2010, Ms. Taylor filed a motion to hold Ms. Hawkins in contempt for violating Ms. Taylor's CPO by posting messages on Ms. Taylor's Facebook page.[1] Ms. Hawkins was arraigned on that charge a week later. On the same day that Ms. Hawkins was arraigned, Ms. Hawkins filed her own contempt motion, alleging Ms. Taylor had violated the conditions of Ms. Hawkins's CPO by contacting Ms. Hawkins via phone and text message and requesting to be "friends" with Ms. Hawkins's new boyfriend on Facebook. Ms. Hawkins's Motion to Adjudicate Criminal/Civil Contempt was filed under the same case number as her CPO and captioned as "Kimberly Hawkins, Petitioner, vs. Patrice Taylor, Respondent." The three-page motion, filed on what appears to be three copies of the same court-issued form, included boxes to check if copies had been sent "to U.S. Attorney" or "to Corporation Counsel." All of the boxes were left blank.

Shortly after Ms. Hawkins's arraignment on Ms. Taylor's contempt charges, Ms. Taylor was arraigned on Ms. Hawkins's contempt charges and entered a plea of not guilty.[2] Ms. Hawkins represented

---

1. Although the trial judge did not formally take judicial notice of this related proceeding, the parties and the court repeatedly referred to this second case on the record. In fact, both cases were tried in front of the same judge (who was also the same judge who had issued the CPOs) and at times were called before the judge concurrently. In light of this relationship and the trial judge's knowledge of both cases, we take judicial notice of the court records in Ms. Taylor's CPO case against Ms. Hawkins.

2. On the same day as her arraignment, Ms. Taylor filed the second of two supplemental motions to hold Ms. Hawkins in contempt.

herself.[3] The trial judge then addressed Ms. Hawkins to "explain to [her] what's going on."

The trial judge informed Ms. Hawkins that Ms. Hawkins had charged Ms. Taylor with "a criminal offense," and that Ms. Taylor, as the defendant, would thus have a right to counsel. But, the judge explained to Ms. Hawkins, "because of the way the law is written, we cannot appoint an attorney to you." The judge suggested that Ms. Hawkins "try to see if you could get an attorney from the legal clinics to help you out; give you some guidance, et cetera." (He later advised Ms. Hawkins to "go to the Domestic Violence Unit [of the USAO]" and "ask to talk to a prosecutor to explain your situation."[4]) Having informed Ms. Hawkins that she was on her own, the judge instructed her that "[w]hen we come back for the trial, it will be for you to bring with you every proof you have indicating what you say she did to you." Alternatively, the judge suggested that Ms. Hawkins and defense counsel "talk to see if [you] can negotiate a settlement."

After hearing this explanation from the trial judge, Ms. Hawkins noted that Ms. Taylor's contempt case against her was scheduled for trial in six days, and she asked if the cases could be "combine[d]." As Ms. Hawkins viewed the proceedings, consolidation made sense because "I have mine against her; she has hers against me." After determining that Ms. Taylor's defense counsel could not prepare for trial in less than a week, the trial judge denied this request.

At the close of Ms. Taylor's arraignment, Ms. Hawkins alleged that Ms. Taylor had yet again violated the CPO the day before. The trial judge interjected and directed both Ms. Hawkins and Ms. Taylor to "start behaving" themselves; he further warned them that "[s]omebody is gonna wind up going to jail if you ... don't behave like mature adults."

Before the parties returned for trial on the contempt charges brought by Ms. Hawkins, Ms. Taylor's contempt case against Ms. Hawkins went to trial and Ms. Hawkins was convicted. Sentencing was scheduled for the date of Ms. Hawkins's trial against Ms. Taylor but had to be continued because Ms. Hawkins's attorney was absent.

Ms. Hawkins's case against Ms. Taylor proceeded, however. The judge began Ms. Taylor's trial by explaining to Ms. Hawkins the basics of trial procedure. The judge reiterated to Ms. Hawkins that, even though Ms. Taylor would have counsel "because this is a criminal matter," "[i]t will be you representing yourself." "[T]o expedite matters," however, the judge informed Ms. Hawkins that he would "ask ... a series of questions to help her present the evidence that is most favorable to [her] based on [her] allegations." "After [Ms. Hawkins] answer[ed] all [his] questions," the judge explained to Ms. Hawkins that she would be cross-examined by defense counsel. The judge told Ms. Haw-

---

Among other things, Ms. Taylor alleged that Ms. Hawkins approached her at the courthouse and asked Ms. Taylor "to drop my charges against her." When Ms. Taylor refused, Ms. Hawkins allegedly "stormed" away and said, "Ok watch."

3. An Assistant United States Attorney momentarily appeared "on behalf of the United States," but she apparently had no paperwork regarding the case and, after a confused exchange with the judge and the courtroom clerk regarding whether there was "an attached criminal case," she did not speak on the record again at this or any subsequent proceeding.

4. The record does not reflect whether Ms. Hawkins ever followed this advice.

kins that she would then have an opportunity "to respond to or clarify anything that you think needs clarification based on the questions that [defense counsel] asks you." In the event Ms. Taylor chose to testify, the judge explained to Ms. Hawkins that "just like the lawyer asked you questions, you have the right to ask h[er] questions, but again, you're not trained on how to ask those kind of questions ... so I'll ask you if there is any kind of question you want me to ask [her] to see if there's any question that's appropriate and if so, I will ask her the questions." Finally, the judge explained that "[o]nce we are done, each side will get to have what is called a closing argument."

The trial proceeded in the manner described. There were no opening statements. The only witnesses to testify were Ms. Hawkins and Ms. Taylor, each of whom testified that she was the victim of harassment by the other. The judge began the trial by conducting a direct examination of Ms. Hawkins from the bench. Ms. Taylor's counsel cross-examined her and the judge conducted the redirect. Ms. Taylor then took the stand to testify in her defense. As promised, the judge assisted Ms. Hawkins in her cross-examination of Ms. Taylor by asking Ms. Taylor questions suggested to the court by Ms. Hawkins. After Ms. Taylor completed her testimony, the judge informed Ms. Hawkins that she could also "make a statement on your defense or disput[e] any other things she said" "because you are not able to articulate the questions." As authorized by the judge, Ms. Hawkins returned to the stand and made rebuttal statements. The parties then gave closing arguments, but the judge took the admittedly "unusual" step of directing defense counsel to go first "to give [Ms. Hawkins] the opportunity to lis-

ten to an attorney give a closing argument." The judge found Ms. Taylor guilty of one count of criminal contempt relating to a phone call from Ms. Taylor to Ms. Hawkins.[5]

In presenting his findings, the trial judge remarked that "[i]n many ways, the truth of what happened has long disappeared." The only evidence was "[i]n the mind of Ms. Hawkins and in the mind of Ms. Taylor" and, as a consequence, the trial judge's fact-finding turned entirely on "the demeanor of the parties." The judge said he relied on "how you two behave[d] on the witness stand, how you two behave[d] while the other one was on the witness stand, the expressions each have had as the other one testified, the history of the case, the animosity that there is or the animosity that there is not." The judge then noted that it was "clear" there was mutual animosity:

> I mean there is no denying that these two young ladies have been feuding way back when, since at least July of 2009 ... and they both testified that the other was sending the other text messages, dirty messages, harassing calls. So, you are both capable of doing this and you have both done it to each other. I don't have any doubt about that and I have [to] proceed with that in mind.

The judge concluded the trial by noting that "[t]his is a sad situation" because "both" Ms. Hawkins and Ms. Taylor viewed the proceedings "as a game." The judge informed Ms. Hawkins and Ms. Taylor that he was considering "sentenc[ing] each of you to what the other one says I should sentence the other." In the meantime, the judge instructed both women that they "need[ed] to really do a lot of thinking and not a lot of doing," and he

---

**5.** The two other counts had been dismissed earlier in the trial, one after Ms. Hawkins testified and before Ms. Taylor took the stand, and the other at the close of all the evidence.

reiterated that "it is clear from the evidence that you both just have this feud with each other that makes no sense, absolutely no sense." Again, indicating that the sentencing decision for each woman lay in the other woman's hands, the judge stated "[l]et's see if I can get some kind of agreement."

Although Ms. Hawkins and Ms. Taylor both returned to court in late March 2010 to be sentenced on their respective contempt convictions, the proceedings in their cases did not conclude. Because Ms. Taylor had filed a motion to vacate the judgment or for a new trial (in which she alleged that she had new evidence that Ms. Hawkins had fabricated the case against her),[6] the judge continued Ms. Taylor's sentencing until April. The judge then proceeded to Ms. Hawkins's sentencing.

After both women spoke, the judge urged the women to reconcile and returned to his theme that this was a frivolous dispute: "[w]e don't need this. This is embarrassing, embarrassing for all of us that we have to go through this." The judge concluded that both women "need to grow up. We have so many other important things to do for ourselves." The judge then sentenced Ms. Hawkins to 180 days of jail time, suspended, and one year of probation.

When the parties returned a month later to address Ms. Taylor's motion to vacate the judgment or for a new trial, counsel for Ms. Taylor informed the judge that she had a new, outstanding motion for contempt against Ms. Hawkins, but that she would drop it if her motion for a new trial were granted. The judge advised Ms. Hawkins to think it over—to consider that, if she dropped her case, "you both can walk out of here right now and have noth-ing else going on in here." But Ms. Hawkins indicated she was not willing to let Ms. Taylor off the hook: "No, sir. I'm on probation right now. I go see a probation officer. I pee, I urine twice a week, and I go see a probation officer once a week, so, no, sir. No, sir." Ms. Hawkins was adamant that she would not dismiss her case against Ms. Taylor and that she thought it deeply unfair that she had been punished and Ms. Taylor had not. She refused the judge's suggestion that she consult with the attorney negotiators before making her final decision regarding dropping her case: "I can't negotiate with that at all. I'm willing to go to trial for that motion because I'm on probation. She was supposed to be sentenced the same day as me."

In response to Ms. Hawkins's outburst, the judge responded: "Relax. Relax. Relax. You['re] even getting me excited because you aren't even listening." The judge then advised Ms. Hawkins that she was "running a gamble" that he could grant Ms. Taylor's new trial motion and convict Ms. Hawkins of a second count of contempt which could result in her going to jail. Maintaining that she had not "done anything wrong," Ms. Hawkins said she was willing to take that risk. The judge then declared, "I'm finished. This is not about who's right and who's wrong. This is about being practical. But you know what? I'm—I'm finished." The judge announced, "I'm gonna recuse myself from this. I'm gonna pass this to another judge and let the other judge deal with it." The judge explained, "I don't think it would be fair to either one of you . . . for me to go ahead and deal with this motion for a new trial."

---

6. Counsel for Ms. Taylor informed the court that Ms. Taylor had also filed additional con-tempt charges against Ms. Hawkins.

The case was sent to another judge[7] (the "recusal judge") that same day. After the recusal judge and the parties scheduled a new date for a hearing on the motion, Ms. Taylor informed the recusal judge that she had just been threatened in the courtroom by friends of Ms. Hawkins. Ms. Taylor also said that she was "trying to be grown-up about it. I'm trying to drop it. My lawyer asked her to drop it. She won't do it. I'm not with her baby father no more. That's what the whole thing was about him. I don't have time for this no more." The recusal judge advised Ms. Taylor that "if you believe that somebody has committed an intra-family offense . . . you can certainly seek relief," and she reminded Ms. Taylor that she had counsel (apparently referring to the case in which Ms. Taylor was a defendant). The recusal judge advised Ms. Hawkins in turn "to make sure . . . you do not violate that civil protection order that's in place."

In response, Ms. Hawkins pleaded for legal assistance:

> I have no representation. . . . And I feel kind of helpless because I have no one. It's like everything just keep[s] being thrown at me, and I don't have any legal representation. And Mr. Nichols, he's not my lawyer anymore on one case [the case in which she had been a defendant]. . . . I really feel hopeless right now. Like, I don't have anyone else to help me out.

Ms. Taylor then reiterated that Ms. Hawkins should just drop her case: "I'm just trying to get over this. I mean, if she drops her charges, right now, I'll drop mine. That's it. That's all. . . . [I]f she feel[s] so hopeless about what's going on, why not drop it?" The recusal judge did not comment other than to remind the parties to return to court for their next hearing.

The parties returned to court in May for argument on Ms. Taylor's motion to set aside the judgment of her conviction or for a new trial, and then again in June for a ruling. But at the June proceeding, the recusal judge announced that because Ms. Taylor's motion for a new trial turned on issues of credibility she would not rule and that the motion had to be decided by the trial judge.

The remainder of the June hearing addressed new charges that Ms. Taylor and Ms. Hawkins had filed against each other. The recusal judge remarked that "[t]here [are] so many cases going on between the two of you that I'm going to have to draw a chart to see what's going on." Ms. Hawkins and Ms. Taylor were twice directed to "switch" places so that the cases against them could be addressed. Tensions flared in the courtroom for reasons not clear on the record, and the court admonished both Ms. Hawkins and Ms. Taylor: "The two of you constantly do that. . . . If you, either of you, continue to do that, you're going to be stepped back."

After the case was returned to him, the trial judge denied Ms. Taylor's motion for a new trial. He then sentenced Ms. Taylor on August 20, 2010. Ms. Hawkins did not speak at this proceeding because she was not present; the judge had excused her from having to appear. Counsel for Ms. Taylor acknowledged that "the situation between Ms. Hawkins and Ms. Taylor is a complete mess" and expressed hope that Ms. Taylor had "learned something from having gone through this appearance—a lot of court appearances we have made in this case." Counsel asked for a period of unsupervised probation "since— we have been litigating this matter . . .

---

7. The Honorable Fern Saddler.

over eight, nine months now." For her part, Ms. Taylor apologized to the court "for even letting something like this take me out of my character." The judge then announced his sentence, 180 days, suspended, and one year probation, the same sentence he had given to Ms. Hawkins. The judge noted that Ms. Taylor's counsel had "said the situation between you and Ms. Hawkins is a mess" but the judge disagreed: "[I]t's not just a mess, it's an embarrassing mess. You know, two young ladies ... don't need to be going through this.... It's just ridiculous."

## II. Analysis

The record is clear that the complainant, Ms. Hawkins, was acting on her own and in her own interest when she filed charges and then secured Ms. Taylor's conviction for criminal contempt. Ms. Taylor understandably did not object that she could not be privately prosecuted by an interested party; the case law at the time of trial permitted just that.[8] In the absence of any timely objection, we review for plain error whether Ms. Hawkins [9] should have been able to privately prosecute Ms. Taylor. We look to Supreme Court jurisprudence as well as our case law to guide our plain error analysis.

 The test for plain error is meant to strike a "careful balance ... between judicial efficiency and the redress of injustice." *Puckett v. United States*, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (citing *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1

(1985)). Through plain error review, this court places limits on its own authority to review errors raised for the first time on appeal so as to "induce the timely raising of claims and objections" at trial to any error that has occurred to the defendant's detriment. *Id.* at 134, 129 S.Ct. 1423; *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc) (noting that plain error review "discourage[s] the intentional withholding of objections by defense counsel"). We have said " 'reversal for plain error ... should be confined to particularly egregious situations.' " *Wheeler v. United States*, 930 A.2d 232, 242 (D.C. 2007) (brackets removed) (alteration in original) (quoting *Dixon v. United States*, 565 A.2d 72, 75 (D.C.1989) (internal quotation marks omitted)). But regard for efficiency has its limits, and plain error review does not give this court license to rubber-stamp procedures antithetical to our adversarial system of justice. Rather,

> "[o]ur need to encourage all trial participants to seek a fair and accurate trial the first time around," must be balanced "against our insistence that obvious injustice be promptly redressed." Therefore, even though "not properly raised, yet if a plain error was committed in a matter so absolutely vital to [the] defendant, we feel ourselves at liberty to correct it."

*Wheeler*, 930 A.2d at 242 (brackets and citation removed) (quoting *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Wiborg v. United*

---

8. This court held in *In re Robertson*, 940 A.2d 1050 (D.C.2008) (*Robertson I*) that "under the intrafamily offense statute, a criminal contempt proceeding is properly brought in the name of a private person, here [the beneficiary of the CPO], rather than in the name of the sovereign." *Id.* at 1058.

9. Ms. Hawkins has not filed a brief in this court; rather, although the United States "did not participate" in Ms. Hawkins's prosecution of Ms. Taylor in Superior Court, the government asked to be treated as the appellee in this court. We are grateful for the government's participation in the appellate litigation of this case. We are also grateful to the amici who filed briefs in this court.

*States,* 163 U.S. 632, 658, 16 S.Ct. 1197, 41 L.Ed. 289 (1896)).

The test for plain error is well-established. An appellant must show (1) that there was a " 'deviation from a legal rule,' " *Puckett,* 556 U.S. at 135, 129 S.Ct. 1423 (brackets removed) (quoting *Olano,* 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)); (2) that this error was "clear or obvious, rather than subject to reasonable dispute," *id.* (citing *Olano,* 507 U.S. at 734, 113 S.Ct. 1770); and (3) that this error affected the defendant's substantial rights (either because defendant was demonstrably prejudiced or because the error was structural in nature and thus "intrinsically harmful"), *Fortune v. United States,* 59 A.3d 949, 956 (D.C. 2013); *see also Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). If these three prongs of the test are satisfied, then this court "has the *discretion* to remedy the error," although this discretion should only be exercised if the error " 'seriously affects the fairness, integrity or public reputation of judicial proceedings.' " *See Puckett,* 556 U.S. at 135, 129 S.Ct. 1423 (brackets removed and internal quotation marks omitted) (quoting *Olano,* 507 U.S. at 736, 113 S.Ct. 1770). We examine each of the four prongs of the test for plain error below.

### A. *Prong One*

We first consider if it was error to allow Ms. Hawkins to prosecute Ms. Taylor.[10] Two recent decisions from this court—*Robertson II* and *Jackson*—establish that it was.

We recently discussed in *Jackson* both *Robertson II* and its predecessor *Robertson I,* and we need not set forward the complicated factual and procedural history of those cases in great detail here. This court held in *Robertson I* that "under the intrafamily offense statute, a criminal contempt proceeding is properly brought in the name of a private person, here [the beneficiary of the CPO], rather than in the name of the sovereign." 940 A.2d at 1058. The Supreme Court granted Mr. Robertson's petition for certiorari but then dismissed it as improvidently granted; this dismissal was accompanied by a dissenting opinion in which Chief Justice Roberts, joined by three other justices,[11] remarked that *Robertson I* 's ruling constituted a "startling repudiation" of the "basic understanding" that "[o]ur entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another." *Robertson v. United States ex rel. Watson,* 560 U.S. 272, 130 S.Ct. 2184, 2188, 176 L.Ed.2d 1024 (2010) (Roberts, C.J., dissenting) (order dismissing certiorari as improvidently granted). In particular, the Chief Justice's dissent noted that "the Due Process Clause ... guarantees particular rights in criminal prosecutions because the prosecutor is a state actor, carrying out a 'duty *on the part of the Government,*' " and he ques-

10. We could conclude that the government conceded this prong of the plain error test. The government did not address it in its briefs and declined at oral argument to take a position on this preliminary question, even when asked to do so. Nonetheless, we analyze all four prongs of the plain error test in order to explain why we deem it appropriate to reverse Ms. Taylor's conviction.

11. Justices Scalia, Kennedy, and Sotomayor joined Chief Justice Roberts's dissent. Justice Sotomayor, joined by Justice Kennedy, wrote a separate dissent clarifying that she joined the Chief Justice's dissent "with the understanding that the narrow holding it proposes does not address civil contempt proceedings or consider more generally the legitimacy of existing regimes for the enforcement of restraining orders." 130 S.Ct. at 2191 (Sotomayor, J., dissenting).

tioned how these constitutional rights could attach in the case of a private prosecutor who is not a state actor. *Id.* at 2187 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

This court then granted rehearing in *Robertson II*, 19 A.3d at 751. We determined that D.C.Code § 16–1005(f) (2011), which authorizes contempt prosecutions for violations of intrafamily CPOs, is a "penal statute which addresses a public wrong." 19 A.3d at 759. And we held that an intrafamily criminal contempt action "initiated in the Superior Court, an Article I court under the Constitution of the United States, … [must] be brought in the name [of] and pursuant to the sovereign power of the United States." 19 A.3d at 755.

*Robertson II* left two questions unanswered: (1) "who could initiate criminal contempt proceedings pertaining to alleged criminal contempts in cases of intrafamily offenses," and (2) what would be "the proper procedures governing those proceedings." *Jackson*, 51 A.3d at 537. We resolved these issues in *Jackson*.[12]

We were asked in *Jackson* to consider whether a trial judge could take on the additional role of prosecuting contempt charges arising out of an alleged violation of an intrafamily CPO where no government prosecutor was present. While affirming that a "trial judge[ ] may initiate and preside over" such cases, we held that the judge could not act as prosecutor as well. *Id.* at 538. We noted that, "[u]nder our system of government, criminal prosecution is a 'core executive function,' " *id.* (quoting *Morrison v. Olson*, 487 U.S. 654, 688, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988)). And we expressed concern that, if

a judge were permitted to wear two hats of prosecutor and arbiter of guilt, "even … the most conscientious trial judge," *id.* at 541, might have difficulty in fulfilling his obligation to " 'vindicate the public interest in the enforcement of the criminal law while at the same time safeguarding the rights of the individual defendant,' " *id.* at 538 (quoting *Standefer v. United States*, 447 U.S. 10, 25, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)); *see also id.* at 541 (noting that "[a]ctual prosecution of criminal contempt by the government or an appointed disinterested prosecutor leaves the trial court free to play its essential role of impartial decision maker in cases and controversies").

Having determined that trial judges may not prosecute these cases themselves, we examined what should happen "when the need arises for a prosecutor in an indirect criminal contempt matter relating to CPO violations in intrafamily offense cases." *Id.* at 531. We held that trial judges should turn first to the government offices within the executive branch authorized to prosecute crimes in the District of Columbia—the USAO and the OAG, *see* D.C.Code § 23–101 (2012)—and "ask [them] to prosecute the criminal contempt in the name of and pursuant to the sovereign power of the United States." *Jackson*, 51 A.3d at 531. We further held that "if both the [USAO] and the OAG decline to prosecute, then trial judges may appoint a private attorney to prosecute the criminal contempt in the name and on behalf of the United States." *Id.* Lastly, narrowing the field of lawyers who could be appointed by the court, we prohibited the appointment of "the attorney for the beneficiary of a CPO," *id.* at 540, and held that court-appointed counsel " 'should be as disinter-

---

12. It is our understanding that, even prior to *Jackson*, the Superior Court had discarded its practice of permitting complainants to prose-

cute their own intrafamily contempt cases. *See generally Porter v. Jones*, 139 Daily Wash. L. Rptr. 1777 (D.C.Super.Ct. Aug. 9, 2011).

ested as a public prosecutor who undertakes such a prosecution,'" given that they are "'appointed solely to pursue the public interest in vindication of the court's authority,'" *id.* at 539 (quoting *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 804, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)).[13]

We established these appointment procedures to fulfill the demands of due process. We recognized that "'the contempt power may be abused'" and, "[t]o guard against the possibility of such abuse," we held "that trial court judges must be scrupulously aware of due process considerations in these types of indirect CPO criminal contempt cases, and should afford a defendant adequate protections, including ... a disinterested prosecutor, an impartial decision maker, [and] an attorney...." *Id.* at 541 (alteration removed) (quoting *Pounders v. Watson,* 521 U.S. 982, 988, 117 S.Ct. 2359, 138 L.Ed.2d 976 (1997)).

■ This court's decisions in *Robertson II* and *Jackson* leave no room for Ms. Hawkins to privately prosecute Ms. Taylor for criminal contempt in Superior Court. Pursuant to *Robertson II,* any contempt prosecution of Ms. Taylor "had to be brought in the name [of] and pursuant to the sovereign power of the United States." *See* 19 A.3d at 755. But Ms. Hawkins did not meet the criteria established in *Jackson* for those who are authorized both to act as government agents and to wield the significant power of the sovereign in intrafamily contempt cases. Ms. Hawkins was

neither a government attorney, nor a disinterested lawyer appointed by the court. Rather, she was the complainant, by definition and in fact an interested party. And, as a non-lawyer, she was an individual who lacked even the basic credentials— a law degree and membership in good standing of a state bar—or skills to serve as a representative of the government in a court of law.

For this reason, the trial judge understandably felt obligated to give Ms. Hawkins extensive assistance in presenting her evidence and challenging Ms. Taylor's evidence. In this two-witness case, the judge conducted the direct and redirect examinations of one witness, Ms. Hawkins, and he inserted himself into the cross-examination of the other, Ms. Taylor. But these procedures put the court in the untenable position at trial of appearing to be the prosecutor of Ms. Hawkins's case, in violation of *Jackson,* 51 A.3d at 538, and it meant that the court itself was responsible for eliciting all the evidence that it would then have to assess to determine whether Ms. Hawkins had satisfied her burden of proof, in tension with *Jackson, id.* at 541 (recognizing the importance of "leav[ing]" the trial court free to play its essential role of impartial decision maker").

In short, *Robertson II* and *Jackson* compel a conclusion that to allow Ms. Hawkins's personal prosecution of Ms. Taylor, with substantial assistance from the trial judge, was error.

---

13. By disinterested, we explained we did not mean that the line AUSAs or AAGs or their court-appointed substitutes must be indifferent to the outcome of the case. They may certainly have an "'interest ... in bringing a defendant to justice with respect to the crime with which he is charged.'" *Jackson,* 51 A.3d at 539 n. 13 (quoting *Wright v. United States,* 732 F.2d 1048, 1056 (2d Cir.1984)). But they may not have "'an axe to grind

against the defendant'" or "'a special motivation to favor the victim or satisfy a victim's private agenda if that agenda is inconsistent with the prosecutor's public duty to serve all the people neutrally, *i.e.,* equally and fairly.'" *Id.* (quoting *Wright,* 732 F.2d at 1056; Bennett L. Gershman, *Prosecutorial Ethics and Victims' Rights: The Prosecutor's Duty of Neutrality,* 9 Lewis & Clark L.Rev. 559, 563 (2005)).

## B. *Prong Two*

 Having discerned error, we turn to consider if the error was "plain." "[I]t is enough that an error be "plain" at the time of appellate consideration." *Thomas v. United States,* 914 A.2d 1, 20 (D.C.2006) (so holding " 'where the law at the time of trial was settled and clearly contrary to the law at the time of appeal' ") (quoting *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)); *see also Henderson v. United States,* —— U.S. ——, 133 S.Ct. 1121, 1124–25, 185 L.Ed.2d 85 (2013) (holding that even if the law was unsettled at the time of trial, the appellant need only show that the error was "plain" at the time of appeal) [14] To be "plain," an error should be "clear or obvious, rather than subject to reasonable dispute." *Puckett,* 556 U.S. at 135, 129 S.Ct. 1423. We determine that, post *Jackson* and *Robertson II,* it is manifest error for Ms. Hawkins to have prosecuted Ms. Taylor.

 We acknowledge the government's argument to the contrary. Although it effectively conceded error, *see supra* note 10, the government vigorously argues that this error was not plain because, in the wake of *Robertson II,* it was not obvious that Ms. Hawkins could not act, and thus was not acting, in the name of and pursuant to the power of the United States. In other words, the government argues that *Robertson II* can reasonably be interpreted to authorize a post hoc fiction: namely, that an individual pro se complainant who gave every appearance of acting independently of the government and in her own self-interest at the time of trial, could be deemed after the fact to have acted in the name of and pursuant to the power of the United States because, pursuant to *Robertson II,* a legitimate contempt prosecution could not have taken place unless this was the case. We need not address the merits of this circular logic because this court's decision in *Jackson* dispenses with any notion that interested parties may privately prosecute contempts in Superior Court on the government's behalf.[15]

## C. *Prong Three*

 The third step of the plain error test is to consider if the error affected the defendant's "substantial rights."[16] *Puckett,* 556 U.S. at 135, 129 S.Ct. 1423. This part of the analysis generally requires a demonstration of prejudice to the defendant, except when errors are "structural" in nature. *Fortune,* 59 A.3d at 956. Unlike a trial error, which is "capable of

---

14. One could say that, after the mandate issued in *Robertson I* in June 2008, the law was settled that a private party like Ms. Hawkins could personally prosecute an intrafamily contempt charge. Alternatively, one could say that the law became unsettled in 2010—in the span of months that this case was litigated—after the Supreme Court granted certiorari and then issued its order denying certiorari as improvidently granted with a dissent from four Justices that seriously questioned the holding of *Robertson I.* We need not resolve this issue, however, because *Thomas* and *Henderson* lead us to the same conclusion.

15. To support its argument that this was not obvious error, the government also cites to this court's decision in *Green v. Green,* 642 A.2d 1275 (D.C.1994). But *Green* predates *Robertson II* and *Jackson* and did not involve a pro se prosecution by a nonlawyer. Moreover, as we noted in *Robertson II,* the court in *Green* never reached the question whether "the beneficiary of a CPO may initiate a CPO enforcement action (criminal contempt action) in her own name rather than in the name of the United States." *Robertson II,* 19 A.3d at 760 n. 15.

16. Again, this is a step of the plain error test we could deem conceded by the government due to the absence of any argument in its briefs to the contrary. Nevertheless, we choose to address it. *See supra* note 10.

being 'quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless,' " a structural error " 'affect[s] the framework within which the trial proceeds.' " *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 308, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Neder*, 527 U.S. at 8, 119 S.Ct. 1827). Because structural errors are recognized as "intrinsically harmful," a " 'defendant's substantial rights will be deemed to have been affected, without need for further analysis in the context of the particular trial.' " *Id.* (quoting *Arthur v. United States*, 986 A.2d 398, 413 (D.C. 2009)).

Only a limited class of constitutional errors qualify as structural errors, *see Neder*, 527 U.S. at 8, 119 S.Ct. 1827; this limited class includes the complete denial of a defendant's right to counsel and adjudication by a biased judge, *id.* (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)). As the Supreme Court explained in *Neder*:

> Such errors "infect the entire trial process," and "necessarily render a trial fundamentally unfair." Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair."

527 U.S. at 8–9, 119 S.Ct. 1827 (alteration and citations omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)).

We conclude that the structural error label applies here. Just as the lack of defense counsel or absence of a neutral judge at trial defies a prejudice analysis, so too does the absence of a disinterested prosecuting attorney acting as an agent of the government. We entrust the power of prosecuting crimes, and with it "the terrifying force of the criminal justice system," *Robertson v. United States ex rel. Watson*, 130 S.Ct. at 2185, to prosecutors. They are the "architects" of justice,[17] and, "[t]he fair administration of justice relies, in large part, upon the[ir] integrity, honesty and trustworthiness." *In re Howes*, 39 A.3d 1, 21 (D.C.), *as amended nunc pro tunc*, 52 A.3d 1 (D.C. 2012). Indeed, "it is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion." *Young*, 481 U.S. at 810, 107 S.Ct. 2124 (plurality opinion concluding that the appointment of counsel for an interested party as a criminal contempt prosecutor was "so fundamental and pervasive" an error that it required reversal without assessing prejudice to the defendant). As the Supreme Court stated in *Young*:

> Between the private life of the citizen and the public glare of criminal accusation stands the prosecutor. That state official has the power to employ the full machinery of the state in scrutinizing any given individual. Even if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life. For this reason, we must have assurance that those who would

---

17. *Cf. Miller v. United States*, 14 A.3d 1094, 1107 (D.C.2011) (withholding *Brady* information " 'casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice' " (quoting *Brady v. Maryland*, 373 U.S. 83, 88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963))).

wield this power will be guided solely by their sense of public responsibility for the attainment of justice.

*Id.* at 814, 107 S.Ct. 2124.

A criminal prosecution conducted by a self-interested, pro se individual, rather than by a prosecutor, is simply a different, lesser proceeding. Such a proceeding not only fails to comport with due process guarantees owed to a defendant, but also does not fulfill our societal expectations for the prosecution of crime.

 At the outset of a criminal case, we rely entirely on prosecutors' discretion with respect to charging decisions—a critical but largely unseen part of the criminal justice process. *United States v. LaBonte,* 520 U.S. 751, 762, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) ("[T]he discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect . . . is an integral feature of the criminal justice system. . . ."). A prosecutor is, as a government official, "publicly accountable" and may be indirectly influenced by "budgetary considerations." *See Cheney v. United States District Court for the District of Columbia,* 542 U.S. 367, 386, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004). But, absent exceptional circumstances, we do not disturb prosecutors' discretionary determinations in this sphere. *See District of Columbia v. Economides,* 968 A.2d 1032, 1036 (D.C.2009) (" '[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute or regulation, the decision of whether or not to prosecute, and what charges to file . . . generally rests entirely

in the prosecutor's discretion.' " (brackets removed) (quoting *United States v. White,* 689 A.2d 535, 538 (D.C.1997))); *see also Ferrell v. United States,* 990 A.2d 1015, 1021 (D.C.2010) (The choice to dismiss a charge is "the prerogative of the Executive Branch."). Thus, we leave it to prosecutors to weigh "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). In short, we entrust to prosecutors the task of "filter[ing] out insubstantial legal claims," *see Cheney,* 542 U.S. at 386, 124 S.Ct. 2576, and, ultimately, the task of deciding which cases should be the business of our criminal courts.[18]

Beyond determining which cases to bring to court, we rely on government prosecutors to ensure that those cases are litigated fairly and justly. The Supreme Court captured the ideal of the government prosecutor in this oft-quoted passage from *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suf-

---

**18.** As we acknowledged in *Jackson,* criminal contempt proceedings are slightly different in that a court has an initial say in whether defiance of its authority requires vindication and may appoint counsel for this purpose if a public prosecutor declines the case upon re-

ferral. *See Jackson,* 51 A.3d at 538–39. Even so, a court could not compel an appointed prosecutor to pursue a criminal prosecution in a contempt case if the prosecutor determined the case should be dropped.

fer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88, 55 S.Ct. 629. To serve this ideal, prosecutors are required to take certain actions and refrain from others in the course of a criminal prosecution.

■ Before trial, prosecutors are required to provide the defense with adequate discovery, both as a matter of due process, *see Brady*, 373 U.S. at 87, 83 S.Ct. 1194, and, pursuant to court rule, *see* Super. Ct.Crim. R. 16 (detailing disclosure obligations of "government" counsel), so that the defense can investigate and prepare its case. This "timely disclosure 'serve[s] to justify trust' " that the prosecutor is acting in the public interest to pursue justice. *Mackabee v. United States*, 29 A.3d 952, 957 n. 14 (D.C.2011) (alteration in original) (quoting *Kyles*, 514 U.S. at 439, 115 S.Ct. 1555).

■ At trial, too, we continue to rely on prosecutors to ensure that justice is served. Among other things, we have recognized that it is "implicit in any concept of ordered liberty" that prosecutors "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction," and, even if unsolicited, they may not allow such testimony, "to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *see also Thompson v. United States*, 45 A.3d 688, 693 (D.C.2012) (prosecutor has an obligation "to ensure that the jury was not misled by false or misleading testimony"). Prosecutors are also precluded from making improper arguments to the fact-finder. *Butts v. United States*, 822 A.2d 407, 420 (D.C.2003) ("The prosecutor may not refer to evidence not in the record, make comments intended to inflame the jury, or make statements designed to mislead the jury." (citations omitted)). Beyond these duties, conscientious prosecutors act throughout trial to ensure that the factual and legal basis for a conviction is sound, with the aim of being able to uphold that conviction to appellate courts and the public as the result of a just process.[19]

We conclude that the absence of a prosecutor at the helm of a criminal case is " 'too fundamental to be harmless' " and is not " 'mere trial error[ ].' " *See Kidd v. United States*, 940 A.2d 118, 125 (D.C. 2007) (quoting *Lyons v. United States*, 683

---

**19.** The government suggests in its brief, however, that the absence of a prosecutor likely helped Ms. Taylor—that, because a prosecutor would have known what she was doing, Ms. Taylor only benefitted from a government attorney's absence. But this argument disregards the fact that Ms. Taylor, as a criminal defendant, was entitled to certain constitutional protections vis-à-vis the prosecution, which Ms. Hawkins, as a private actor, had no constitutional obligation to fulfill. More fundamentally, the government's argument disregards the basic premise of our adversarial system of justice: we obtain the best results from our courts when there is effective advocacy on both sides. *Cf. Strickland v. Washing-* *ton*, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results."). Similarly, we reject the government's argument that having a neutral trial judge rendered insignificant the absence of a government prosecutor. No one would say that the trial judge and the prosecutor play the same roles at a trial, and the concern articulated in *Jackson*, echoed here, is that the absence of a prosecutor may lead a trial court to overstep its bounds.

A.2d 1066, 1071 (D.C.1996)) (internal quotation marks omitted). Accordingly, we determine that prong three of the plain error test is satisfied.

### D. *Prong Four*

 When the first three prongs of the plain error test are met, it is a matter of discretion whether this court will reverse a conviction based on an unpreserved error. *See Puckett,* 556 U.S. at 135, 129 S.Ct. 1423. Whether we exercise that discretion is contingent on our determination either that the error in question resulted in "a miscarriage of justice, that is, [the conviction of someone] actually innocen[t]; or that [it] . . . seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." [20] *McClary v. United States,* 3 A.3d 346, 353 n. 5 (D.C.2010) (alterations in original) (quoting *Ferrell,* 990 A.2d at 1022), *amended by* 28 A.3d 502 (D.C.), *order clarified,* 30 A.3d 808 (D.C.2011). The reference to fairness notwithstanding, this is not a prejudice-to-the-defendant inquiry. Whereas prong three asks whether the substantial rights of the defendant have been compromised, prong four concerns itself with the court's interests and its "responsibility to protect the fairness of judicial proceedings." [21] *Nelson v. United States,* 55 A.3d 389, 394 (D.C.2012). Put simply, this is a prejudice-to-the-court inquiry, the object of which is to determine whether this court can affirm the conviction without compromising its goal of delivering justice or diminishing itself in the eyes of the public.

 We have recognized that " 'any error that is "structural" is likely to have an effect on the fairness, integrity or public reputation of judicial proceedings.' " *Fortune,* 59 A.3d at 957 (quoting *Barrows v. United States,* 15 A.3d 673, 679 (D.C. 2011)); *see also Barrows,* 15 A.3d at 679 (noting that a "number of federal appellate courts have reasoned that because a structural error . . . 'necessarily render[s] a trial fundamentally unfair,' it is 'difficult to imagine a case where structural error will not satisfy *Olano*'s fourth requirement' " (second alteration in original) (citation omitted) (quoting *Neder,* 527 U.S. at 8, 119 S.Ct. 1827; *United States v. Jimenez Recio,* 371 F.3d 1093, 1103 n. 7 (9th Cir. 2004))). Even so, there is no per se rule, and we conduct a " 'case-specific and fact-intensive,' " inquiry, *Barrows,* 15 A.3d at 680 (quoting *Puckett,* 556 U.S. at 141, 129

---

**20.** The government focuses exclusively on whether Ms. Taylor has demonstrated a miscarriage of justice and never acknowledges that the fourth prong of the plain error test may be satisfied by showing that the error compromised " 'the fairness, integrity or public reputation of judicial proceedings.' " *See Olano,* 507 U.S. at 736, 113 S.Ct. 1770 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). To the extent the government suggests that only a miscarriage of justice showing will do, it misunderstands the requisite analysis. Our test for plain error derives from the Supreme Court's decision in *Olano.* In that case, the Court expressly stated that, while miscarriage of justice or actual innocence cases should "no doubt" satisfy the fourth prong of plain error, it had never held that plain error review was "*only* warranted in cases of actual innocence." *Id.* Instead, the Court held that "the standard that should guide the exercise of remedial discretion . . . [is] . . . if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings,' " a conclusion an appellate court could reach "independent of the defendant's innocence." *Id.* at 736–37, 113 S.Ct. 1770 (brackets removed) (quoting *Atkinson,* 297 U.S. at 160, 56 S.Ct. 391).

**21.** In some cases, prejudice to the defendant also prejudices the court, *see, e.g., Eady v. United States,* 44 A.3d 257, 270 (D.C.2012), but a showing of prejudice is not necessary to fulfill the fourth step of the plain error test, and it is particularly inapt when the error, as here, is structural and thus defies a prejudice analysis.

S.Ct. 1423). With this perspective, we determine that it is appropriate for us to exercise our discretion and reverse in this case.[22]

■■ As a preliminary matter, we note that the supplantation of a disinterested government prosecutor with an interested, private, pro se prosecutor was complete in this case. In contrast, for example, to *Barrows*, where prong four was not satisfied because the error committed by the trial court was temporary in nature, 15 A.3d at 680, Ms. Hawkins filed charges against Ms. Taylor, and at all times thereafter she was unassisted by any government prosecutor or court-appointed counsel in her pursuit of Ms. Taylor's conviction.

Leaving it to Ms. Hawkins to prosecute Ms. Taylor seriously compromised the fairness of the proceedings. Looking first to how the case was tried, we consider the trial judge's (understandable but nevertheless troubling) involvement in the prosecution. Because Ms. Hawkins was not a prosecutor—was not even a lawyer—she did not have the knowledge or skills to litigate a criminal case. Again, as discussed above, this forced the court to step into the breach and outside its role of neutral arbiter to assist her "to present the evidence that [wa]s most favorable to" her at trial—both by conducting the direct examination of Ms. Hawkins and by cross-examining Ms. Taylor with questions suggested by Ms. Hawkins.[23]

In considering the fairness of the proceedings, we also consider the absence of a public prosecutor vis-à-vis the decision to charge and prosecute this case. No neutral charging decision was ever made as to whether to bring charges or maintain them. Rather, these charges (and the ones that followed) appeared grounded in anger and vengeance.[24] Moreover, Ms. Hawkins frankly acknowledged that her refusal to drop her charges (after Ms. Taylor filed her motion for a new trial) was based on pure self-interest: She had been punished, and she wanted Ms. Taylor to be punished too.

■■ Leaving it to Ms. Hawkins to determine that her case against Ms. Taylor would be the business of our criminal courts also seriously compromised the integrity of the proceedings. Contempt actions are meant to vindicate the trial judge's authority, to " 'protect[ ] the due and orderly administration of justice and [to] maintain[ ] the authority and dignity of the court.' " *Jackson*, 51 A.3d at 538 (quoting *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 69 L.Ed. 767 (1925)). But, as is evident from the record, the trial judge never perceived this case as being necessary to vindicate the court's authority. To the contrary, the trial judge gave every indication that he would have washed his hands of this case had he been able.

The trial judge's assessment of this case was that it was the product of a "feud [Ms.

22. Our holding is tied to the facts of this case and we do not decide whether the fourth prong would be satisfied if we confronted this question in another case in which the conduct of the proceedings less evidently reflected a personal vendetta and the lack of any public purpose.

23. The trial judge's initial proposal for sentencing also gives us pause. Although the judge ultimately made its own determination,

he expressed a willingness to delegate his decision to the feuding parties and allow each woman to select the sentence for the other.

24. For example, the events alleged in Ms. Hawkins's charges predated Ms. Hawkins's alleged violation of Ms. Taylor's CPO, yet Ms. Hawkins did not file charges against Ms. Taylor until after Ms. Taylor filed charges against her.

Hawkins and Ms. Taylor had] with each other that makes no sense, absolutely no sense," and he expressed his dismay that both women viewed the proceedings "as a game." Throughout the proceedings, the judge was called upon to mediate flare-ups between the parties and had to admonish the parties to "behave." By the time of sentencing, the judge had reached the conclusion that it was "embarrassing for all of us that we have to go through this." The judge subsequently strongly urged Ms. Hawkins to drop her case in response to Ms. Taylor's motion to vacate the judgment or for a new trial, so that "you both can walk out of here right now and have nothing else going on in here." When Ms. Hawkins adamantly refused, the trial judge, apparently exasperated, announced "I'm finished," and informed the parties that he would recuse himself. And when this case at last came to a close, the trial judge (who had been restored to the case) pronounced the entire matter "an embarrassing mess" that was "just ridiculous."

What this record shows is that, instead of vindicating the judge's authority, this contempt prosecution disempowered the court. Instead of providing a mechanism to enforce order, the proceedings in this case gave Ms. Hawkins and Ms. Taylor a forum to engage in their own private sport of being unpleasant to each other. In short, this case epitomizes why criminal contempt proceedings must not be prosecuted by private actors and must be reserved to government prosecutors acting in the court's, and ultimately the public's, interest.[25]

Lastly, leaving it to Ms. Hawkins to prosecute her part of this feud in court seriously compromised the "public reputation of judicial proceedings." *See Puckett,* 556 U.S. at 135, 129 S.Ct. 1423. We have no doubt that if the Metropolitan Police Department allowed any citizen to grab a badge, a gun, and a cruiser to go out and resolve personal disputes, it would undermine the public's trust in their operations. So too, it reflects poorly on the courts to allow private citizens to harness the machinery of the criminal justice system for their own personal ends—ends which no prosecutor vetted and about which the trial judge expressed active disapproval. We do not think the public would be pleased to know that, in funding the operation of the courts with its tax dollars, it also funded this private feud.[26] And we expect that

---

**25.** The Amicus Brief submitted by DVLeap argues passionately that the courts must be open to the victims of domestic violence to pursue private prosecutions and thereby suggests that the integrity of the courts is compromised by not permitting them. We fully agree that victims of domestic violence should be able to enforce the CPOs they obtain against their abusers. But DVLeap's argument proves too much. There is a grave need to ensure that all manner of crimes are brought to justice. And given resource limitations, the prosecutor's role in screening cases is all the more important.

Moreover, reliance on private prosecution of intrafamily contempt actions seems particularly problematic in that it promotes under—and over-prosecution of these cases. DVLeap notes that victims of domestic violence hesitate to come to court and often abandon the cases they have brought. Reliance on private prosecutions seems a poor choice in this context. (Here Ms. Hawkins was particularly motivated to prosecute Ms. Taylor, but even she repeatedly expressed dismay that she lacked counsel to assist her.) The people who would seem to benefit from such a system are the abusers, who could easily file their own charges to gain leverage over their targets. The problem is a complex one, but it is far from clear that private prosecutions are the answer.

**26.** We have no means of calculating a dollar figure but the amount cannot be insubstantial. There were numerous court proceedings in this case, over a span of many months. The prosecution of this case thus consumed a number of hours of administrative staff, court reporters, and of course, the trial judge. *Cf.*

the public would be shocked to know that one private individual could send another individual to jail.

\* \* \*

A prosecutor representing the interests of the government and thereby the governed is not a dispensable element of a criminal prosecution. Instead, the participation of a prosecutor is essential to the delivery of justice. On the facts of this case, the absence of a prosecutor constitutes plain error. Accordingly, we reverse Ms. Taylor's conviction and remand this case to the Superior Court for further proceedings consistent with this opinion.[27]

*So ordered.*

Concurring opinion by Senior Judge NEBEKER at page 106.

NEBEKER, Senior Judge, concurring:

I concur in the judgment and the first four paragraphs of the opinion of the court, which otherwise abounds in expositions unnecessary to our holding of mani-

*Lowery v. U.S.*, 3 A.3d 1169, 1175 (D.C.2010) (" 'The time of a judge is scarcest of all judicial resources.' " (quoting *United States v. Padilla*, 415 F.3d 211, 225 (1st Cir.2005))).

27. Ms. Taylor also challenges her conviction for one count of contempt on sufficiency grounds. In circumstances where we have determined that there is reversible error, we assess any sufficiency of the evidence challenge only to determine if the government may retry the defendant. *See Thomas v. United States*, 557 A.2d 599, 601 (D.C.1989). It is unclear whether such Double Jeopardy concerns apply here, however, where no government agent prosecuted Ms. Taylor in the first instance. On that basis, we could distinguish this case from *Jackson,* where we reached a sufficiency challenge notwithstanding the absence of a disinterested prosecutor at trial. At least in *Jackson,* a government actor (the court itself) conducted the prosecution.

We need not resolve this question, because even if we were to examine the evidence in

fest error and prejudice. The recitation of public prosecutorial duties and responsibilities in "Prong Three" of that opinion is surely unnecessary where, as here, the error is having a lay antagonist, with help from the trial judge, prosecute the other antagonist. The opinion is, no doubt, a learned and well-written treatise, but much of it is unrelated to the disposition of this appeal. The court's holding here is fact specific, as can be seen by the care taken in stating the facts surrounding this dispute. And in light of the narrowness of that holding, it bears repeating that:

> We decide the cases before us, not hypothetical questions the facts of a particular case do not present. . . . '[T]he duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'

this case, we would deem it sufficient. "In reviewing sufficiency claims, the 'evidence must be viewed in the light most favorable to the prosecution to determine whether a reasonable factfinder could find guilt beyond a reasonable doubt.' " *Johnson v. United States,* 40 A.3d 1, 14 (D.C.2012) (quoting *Lewis v. United States,* 767 A.2d 219, 222 (D.C. 2001)). As noted above, the trial judge found Ms. Taylor guilty of one count of criminal contempt relating to a phone call from Ms. Taylor to Ms. Hawkins. We conclude there was sufficient testimony from Ms. Hawkins to support the court's finding of guilt. Ms. Taylor argues that Ms. Hawkins was not credible, pointing to inconsistencies in Ms. Hawkins's testimony about the date of the call. But it is for the trial court and not this court to resolve such inconsistencies and make credibility determinations. *Id.* ("In reviewing a bench trial, we will not overturn the trial court's factual findings unless they are 'plainly wrong' or 'without evidence to support [them].' " (alteration in original) (quoting *Lewis,* 767 A.2d at 222)).

*In re D.T.*, 977 A.2d 346, 352 (D.C.2009) (quoting *Alpert v. Wolf,* 73 A.2d 525, 528 (D.C.1950)).